CONKLIN ET UX. *v.* SCHILLINGER

[No. 279, September Term, 1968.]

*Decided October 7, 1969.*

The cause was argued before HAMMOND, C. J., and MARBURY, BARNES, FINAN and SMITH, JJ.

*George W. Shadoan,* with whom were *Shadoan & Mack* on the brief, for appellants.

*Charles E. Channing, Jr.,* with whom were *Thomas A. Farrington* and *Sasscer, Clagett, Powers & Channing* on the brief, for appellee.

BARNES, J., delivered the opinion of the Court.

In the personal injury case involved in this appeal, the appellants, Alfred R. Conklin and wife, who were plaintiffs below, challenge the power of the Circuit Court for Prince George's County (Parker, J.) to order a new trial solely because of the size of the verdict of the jury and, assuming that such power exists, they contend that the trial court abused its discretion in that regard. They also contend that they were entitled to have the jury consider the question of punitive damages.

The Conklins filed a declaration, containing five counts, to recover damages resulting from injuries caused by the use by the defendant Schillinger of his automobile on January 22, 1966. The First Count sought punitive damages in the amount of $100,000. The defendant demurred to this Count and his demurrer was sustained by the trial court without leave to amend. Count Two was for recovery for medical and hospital expenses and resulted in a verdict of the jury for $2,700. The Third Count was for personal injuries to the husband, Mr. Conklin, and a jury verdict for $2,300 was returned on this Count. Count Four was for loss of consortium and a verdict of $5,000 was returned on this Count. The Fifth Count, for personal injuries of the wife, Mrs. Conklin, originally contained an *ad damnum* clause claiming $100,000, which, however, was amended in an Amended Declaration filed with the consent of counsel for the defendant-appellee Schillinger to increase the amount claimed to $250,000. The verdict of the jury on Count Five of the Amended Declaration was for $100,000. The defendant-appellee Schillinger sought a new trial, limited to the amount of damages on Count Five alone. A new trial was granted on this Count on damages alone, the trial court being of the opinion that the verdict of $100,000 on this count was "so excessive as to shock the conscience of the Court" and that it was based upon passion, the jury in effect having attempted to punish the defendant because of the grossly negligent manner that caused the accident. Upon the sec-

ond trial on Count Five, the jury found a verdict for $25,-000. The second jury was informed that the claims in Counts Two, Three and Four had been resolved in a prior trial but that jury was not told of the amounts of any of the verdicts in the first trial.

The evidence in the first trial indicated that on Saturday, January 22, 1966, the Conklins had gone to see the races at Bowie in Prince George's County. The husband was a young man (24 years of age at the time of the accident) in the naval service, stationed in Washington. He and Mrs. Conklin lived in Virginia. They had attended the races at Bowie once previously about a year before the day of the accident. Some wet snow had fallen earlier in the afternoon, but apparently, it was not snowing when the Conklins left the track in their automobile at approximately 4:00 P.M., before the last race. When they left the track, they saw a State Policeman stationed at the intersections of Race Track Road and Maryland Route 450. Mr. Conklin was driving the automobile; his wife was in the front right-hand seat. Race Track Road was a one-way, two-lane road and the Conklins' automobile was in the left lane. At the intersection with Route 450, the State trooper directed automobiles in the right lane to turn right and in the left lane to turn left. Mr. Conklin obeyed the direction and turned left on. Route 450. After proceeding to the intersection of Route 450 with Maryland Route 3, Mr. Conklin realized that he was going in the wrong direction to get to Washington, D. C., turned his car around and came back on Route 450 toward Washington. The traffic in the opposite direction was bumper to bumper and was moving at approximately five to ten miles per hour from the race track. While proceeding at approximately 30 to 35 miles per hour in a 50 mile zone, in the right lane of Route 450, up the incline of a hill, the Cadillac of the defendant Schillinger, operated by him, suddenly loomed ahead at the crest of the hill on the wrong side of the road and Mr. Conklin's efforts to pull to the right could not avoid the collision. Mr. Schillinger had pulled out into the wrong lane and

proceeded up the hill at approximately 40 miles per hour, according to one witness, past the stopped traffic in his proper lane. The heavy traffic prevented Mr. Schillinger from pulling back into his proper lane in the event of oncoming traffic. The Conklins had their lights on, but Mr. Schillinger did not have his lights on. Mr. Schillinger estimated that his speed was between 25 and 30 miles per hour. He stated that he had been going to the Bowie races for some 20 years and that on every prior occasion the traffic had been one-way where the accident happened. He testified that he drove in the left-hand lane because no one stopped him and because of his prior experience, he assumed it was one-way. Mr. Schillinger's father-in-law was on the front seat with him. His wife and his sister-in-law were in the rear seat. Mr. Conklin was knocked unconscious as a result of the collision. Mrs. Conklin was thrown through the windshield of the Conklin car. She suffered multiple cuts and lacerations which caused profuse bleeding. The two major facial wounds were described in the operative note of the plastic surgeon the day following the accident, as follows:

> "The patient had a laceration which started in the left cheek opposite the ala of the nose. It went medially across the anterior third of the cheek and into the left nasal cavity near the floor of the nose. This was of bone depth in the center and was of muscle depth through the rest of its extent. There was a rather ragged trap door laceration of the upper left forehead, which was of bone depth in the center. This was about three inches in diamater [sic] and extended around onto the temple to some extent."

The scar from the operation was quite red and elongated for some time after the operation causing Mrs. Conklin to be self-conscious because people were looking at it. This scar had diminished at the time of the trial but her nostril was somewhat distorted.

Also as a result of the accident, there was a sprain of

the muscles and ligaments in Mrs. Conklin's cervical spine. According to Dr. Leo B. Van Herpe, an orthopedic surgeon, who testified for Mrs. Conklin, there were fractures of the transverse processes of the second, third, fourth and fifth lumbar vertebrae on the left side where the quadratus lumborum muscle is attached, the fractures resulting from a violent twisting of the body. This cervical injury healed ultimately without complications. In addition to the original severe pain, Mrs. Conklin suffered intermittent back pains to the date of trial.

Mrs. Conklin suffered a broken left arm at the time of the impact for the treatment of which she received physical therapy for approximately three weeks after the cast was removed. The arm ultimately healed without the necessity of a bone graft. At the time of the trial she still suffered pain in the left arm when she carried a heavy bundle without support and had slight aches when the weather changed.

There was also a fracture of Mrs. Conklin's left ring finger resulting from the accident. There was a nonunion of this fracture, which prevented Mrs. Conklin from having any punch with her fourth left finger and from properly typing. This resulted in a five to ten percent partial impairment of the use of her left hand in the opinion of one of Mrs. Conklin's medical experts.

Mrs. Conklin also suffered injury to her left knee as a result of the accident. The cruciate ligaments, both anterior and posterior, were ruptured, which in the opinion of one of her medical experts, resulted in a permanent disability in her left leg of 20%. A course of daily exercises was prescribed to build up the quadriceps muscle to lend some stability to the left knee. Her medical expert was of the opinion that the knee would worsen with the passage of time resulting from early arthritis. In his opinion, she should continue the prescribed exercises for the rest of her life. Her life expectancy is 56.5 years, Mrs. Conklin being 23 years of age when the accident occurred.

Mrs. Conklin described in detail the serious pains she

suffered at the time of the accident when she regained
consciousness and other pains resulting from the in-
juries already mentioned. Her total medical expenses at
the time of the first trial amounted to $2,009.24. She was
in the hospital for one week and was out of work for
one month, for which she claimed special damages of
$599.38. Her hospitalization ended about February 1,
1966, after which she was seen on an out-patient basis at
Bethesda Naval Hospital, being treated six times begin-
ning February 17, 1966, and extending to March, 1966.
She was referred to Dr. Van Herpe by her counsel, who
thereafter treated her and was her principal medical wit-
ness in the case.

Shortly before trial, Mrs. Conklin was examined by
Dr. Everett J. Gordon who testified for Mr. Schillinger.
Doctor Gordon testified that as a result of his examina-
tion of Mrs. Conklin in regard to the injury to her cerv-
ical spine, he found a good range of motion of the cervical
spine and neck; in regard to the facture of the left fore-
arm, he found the fracture in a good position and with
a very good bony union with a full range of motion of
the left forearm; in regard to the fracture of the distal
end of the ring finger, there was a full range of motion of
all joints of the finger, the nail was hard and had regen-
erated; in connection with the back injury, Mrs. Conk-
lin could touch her fingers to the floor, had a full range
of side motion, there being no tenderness or muscle spasm
and no sign of nerve compression or irritation and in his
opinion, she had recovered from this injury; in regard
to the alleged fractures of the transverse processes, the
small rib-like projections had healed well and the x-rays
taken at the Prince George's Hospital following the ac-
cident indicated "no fracture" of the transverse pro-
cesses; and, finally, in regard to the injury to the left
knee, there was a full range of motion in both knees,
there was no swelling, no fluid, no crepitus or motion,
no sign of torn cartilages, the kneecaps moving freely in
a normal manner, without abnormal motion and the col-
lateral ligaments being intact, the x-rays of the knees in-

dicating that the left knee was normal and there was no atrophy of the muscles of the legs or thighs indicating any disability.

We now turn to the three questions which were raised in the trial court and briefed and argued before us, to which reference has already been made.

### (1)

The Conklins contend that the trial court had no power to grant a new trial on Count Five on the ground of excessive damages. The thrust of their argument is that a correct evaluation of the English decisions prior to 1776 indicates that no such power existed at common law in English trial courts. Hence when Maryland adopted its original Constitution in 1776 providing in its Declaration of Rights that the "inhabitants of Maryland are entitled to the Common Law of England, and the trial by Jury, according to the course of that Law * * *" (this provision having been continued in all subsequent Constitutions of Maryland—See Article 5 of the Declaration of Rights in the Maryland Constitution of 1867), the trial courts in Maryland were given no such power and the attempt to exercise such power violates the constitutional right to trial by jury. We do not agree with this argument for several reasons.

First, our examination of the English decisions prior to 1776 does not indicate to us that the English Courts had uniformly held that they had no *power* to grant new trials in tort cases on the ground that the damages were excessive, although there is some language in a few of the cases which rather indicates this. It appears to us that a consideration of all of the English decisions prior to 1776 on this question establishes that the substantial majority of those decisions reflect the opinion that there was *power* in the English Courts to grant such a new trial. It should be kept in mind, *in limine,* that the English practice in regard to *all motions for new trials* differed during and prior to 1776 from the Maryland practice and the practice in most of the Colonies. Circuit

Judge Medina, speaking for the United States Court of Appeals for the Second Circuit, in *Dagnello v. Long Island Railroad Co.*, 289 F. 2d 797 (1961) aptly summarized the then English practice as follows:

> "Juries were regularly used in the courts of King's Bench, Common Pleas and Exchequer. But motions for new trial were not addressed to the judges who presided over the trials. Instead, such motions were made at Westminster and heard *en banc*, by four of the judges, and the trial judge in a particular case might or might not be one of the four. There was no appeal on the point from the decision of the judges *en banc*." (289 F. 2d at 804)

The case of *Wood v. Gunston*, Style 466 (1655) has been cited as the initial case establishing the practice of granting new trials, but Lord Chief Justice Mansfield in *Bright v. Eynon*, 1 Burr. 390 (1757) at 394 stated that, "It is not true 'that no new trials were granted before 1655;'" and explained that, "The reason why this matter cannot be traced further back, is, 'That the old report-books do not give any accounts of determinations made by the Court upon motions.'"

Lord Chief Justice Kenyon in *Duberley v. Gunning*, 4 T.R. 651 (1792) explained the development of the practice of granting new trials as follows:

> "The ancient method of correcting the errors of juries was by the harsh proceeding of attaint, which was productive of no remedy to the aggrieved party; and therefore the Courts did wisely to rid themselves of such an inconvenience in the administration of justice, by the milder remedy of setting aside an erroneous verdict, and sending the case back to the revision of another jury. This is by no means encroaching upon the jurisdiction of the jury, nor drawing the question to the examination of

a different tribunal from that to which the constitution has referred it; for it is not substituting a different judgment in the place of that which has been pronounced, but requiring the same jurisdiction to reconsider that opinion which appears to be erroneous. Without this general power in the Court, injustice would be done in many cases." (4 T.R. at 654-55)

Although the power of the English Courts to grant new trials in jury cases was firmly established prior to 1655, the grounds upon which the power would be exercised slowly developed over the ensuing years. Lord Mansfield said in 1757 in *Bright v. Eynon, supra*:

"Indeed, for a good while after this time, the granting of new trials was holden to a degree of strictness, so intolerable, that it drove the parties into a court of equity, to have, in effect, a new trial at law, of a mere legal question; because the verdict, in justice, under all the circumstances, ought not to conclude; and many bills have been retained upon this ground; and the question tried over again at law, under the direction of a court of equity. And therefore of late years, the courts of law have gone more liberally into the granting of new trials, according to the circumstances of the respective cases." (1 Burr. at 394-95)

The granting of a new trial because of an excessive jury verdict appears to have been an area of the common law in the early stages of judicial development. *Wood v. Gunston,* Style 466 (1655), *supra, Ash v. Ash,* Comb. 357 (1697) and *Chambers v. Robinson,* 1 Stra. 691 (1726) were early cases in this development and seem to support the granting of a new trial because of a jury verdict for excessive damages.

See also 5 Bacon, *Abridgement* 248 and 3 W. Blackstone, *Commentaries* *388. (The lectures from which the

*Commentaries* were compiled were delivered at Oxford, England in 1758 by Sir William Blackstone, Vinerian Professor.)

In 1764, however, the King's Bench in *Beardmore v. Carrington,* 2 Wils. K.B. 244, stated that it was not yet ready to grant a new trial in a tort case solely for the reason of excessive damages in the verdict. That Court indicated that it believed that the *Wood* and *Ash* cases, *supra,* were really decided on the grounds of misconduct of the jury and that the decision in the *Chambers* case, *supra,* to grant a new trial in a tort case solely because of excessive damages was a bad precedent and should not be followed. In *Beardmore,* however, the King's Bench stated:

> "We desired to be understood that this court does not say, or lay down any rule that there never can happen a case of such excessive damages in tort where the court may not grant a new trial; but in that case the damages must be monstrous and enormous indeed, and such as all mankind must be ready to exclaim against, at first blush." (2 Wils. K.B. at 250)

In *Duberley v. Gunning,* 4 T.R. 651 (1792) a tort action involving damages for criminal conversation, there was a difference of opinion in the King's Bench as to whether or not a new trial should be granted solely because of the excessive damages awarded by the jury. Lord Chief Justice Kenyon was of the opinion that no new trial should be granted because he could not find any standard by which he could ascertain the excess and stated that:

> "Knowing therefore no instance in which a new trial has ever been granted in such a case, upon the ground of excessive damages * * * I have not courage enough to make the first precedent of granting new trials under such circumstances as the present." (4 T.R. at 656)

Justice Buller was of the opinion that the new trial should be granted. He stated:

"* * * I do not apprehend that the power of the Court to grant new trials in any case, if a proper ground be laid for it, has been denied even at the bar. It is certainly established by a variety of authorities in general terms, without making any exception whatever: and this power is repeatedly exercised in cases where the standard for damages is full as uncertain as in the present case. Every case must stand on its own particular circumstances: there is no laying down any fixed rule for ascertaining the damages in many instances. New trials have been granted from the year 1655, at least as appears by a case of that date * * * There are besides many old cases which shew that the instance of the exercise of this power in 1655 was not the first. * * * I cannot bring my mind to say that there shall not be a new trial. Before we can come to such a determination, we must blot out every expression in the books relative to this subject; and in many of them it is expressly said, That the Court may grant a new trial for excessive damages. I agree that there must be facts for the Court to proceed upon, in ascertaining the excess of damages, and granting a new trial on that account: but there are many such facts in this case." (4 T.R. 657-658)

A year after the decision in *Duberley,* however, Lord Kenyon who had been with the majority, apparently had a change of mind and was of the opinion that a new trial in a tort case seeking damages for assault and battery, *Jones v. Sparrow,* 5 T.R. 257 (1793) should be granted solely on the ground of an excessive jury verdict. In referring to *Duberley,* he stated:

"* * * although the case of *Duberley v. Gunning* was decided after a very full discussion of

the subject, the Court were not unanimous * * * But, whether rightly or not decided, that is a case *sui generis*, and cannot govern the present." (5 T.R. at 257)

Three years after the decision of the King's Bench in *Jones, supra,* the Court of Exchequer in *Goldsmith v. Lord Sefton,* 3 Anst. 808 (1796) reaffirmed that the common law of England had established that new trials would be granted in tort cases solely because of an excessive jury verdict. Chief Baron Macdonald stated:

"I can have no doubt that the power of the Court extends to granting a new trial in all cases; the distinction arises only from the difficulty in some of exercising this authority. In matters of contract, the Court have, in general, a certain principle, by which they can determine whether the verdict is proportioned to the injury or not. In matters of tort this is more difficult, and therefore the Courts never interpose to set aside a verdict, except upon a 'glaring case of outrageous damages,' as is observed by the Lord Ch. J., afterwards Lord *Camden,* in *Huckle v. Money,* 2 Wils. 207. In *Jones v. Sparrow* the injury was much more serious than here, the damages not so great, yet the verdict was set aside. In most of the cases where it has been refused, the Court have said that they were not dissatisfied with the verdict, or at least there have been circumstances to warrant damages to nearly the extent given. In *Duberley v. Gunning,* the new trial was refused by a majority of the Judges, on the ground that the nature of the injury, criminal conversation, rendered impossible all computation of the value of the satisfaction.

"By the whole current of authorities, it appears that we are bound to protect a party where, by the improper warmth or worse pas-

sions of a jury, damages glaringly and outrageously great have been given against him. We cannot say what the damages ought to be, but can only send it for the investigation of another jury." (3 Anst. at 809-810)

Barons Hotham and Thomson in separate opinions concurred in the granting of the new trial.

In summary, we are of the opinion that the majority of the English decisions prior to the adoption of the Maryland Constitution of 1776 indicated that *power* existed to grant new trials in tort cases upon the sole ground of a jury verdict for excessive damages and this opinion is confirmed by the English decisions rendered during the 20-year period following 1776.

Secondly, the Maryland practice of granting a new trial by the trial judge in tort cases where the sole ground is an excessive verdict, unless the plaintiff remits the portion of the verdict which the trial court deems excessive, is well established. We have held that this practice does not violate any constitutional rights of the defendant. In *Turner v. Washington Suburban Sanitary Commission*, 221 Md. 494, 158 A. 2d 125 (1960), the Circuit Court for Montgomery County in an action at law to recover damages for trespass to real estate granted the defendant's motion for a new trial unless the plaintiffs remitted $7,-230 of a verdict of $8,730. The plaintiffs filed the remittitur, but reserved and claimed a right to appeal from the judgment of the trial court denying the motion of the plaintiffs to enter judgment for the amount of the jury verdict and to insist that the Court enter judgment for such an amount. A final judgment was entered for $1,500 and costs from which judgment the plaintiffs appealed. There was no cross appeal. In affirming the judgment, the Court held that no constitutional rights of the plaintiffs had been violated. Judge (later Chief Judge) Henderson, for the Court, stated:

"To answer the contention that the court usurped the jury's function, resort must be had

to the appropriate rules of the common law at the time our first constitution was adopted. *Knee v. Baltimore City Pass Ry. Co.,* 87 Md. 623, 624, 633. It would seem that the practice of remittitur was not unknown at that time. See Wayne, *Damages* (11th ed.), p. 635. It was recognized by Mr. Justice Story in *Blunt v. Little,* 3 Mason 102, 107, and has been consistently upheld by the federal courts. Indeed, it may be said that the practice is as much an incident and corrective of jury trial as the right of a trial court to set aside a verdict on the ground that it is against the evidence, or against the weight of the evidence. Cf. *Snyder v. Cearfoss,* 186 Md. 360, 368. The plaintiff is not obliged to remit. He has the option of accepting the alternative and trying the case again. As expressed by some of the commentators, the right to jury trial is a right to a 'properly functioning' jury. See Carlin, *Remittiturs and Additurs,* 49 W. Va. L. Quar. 1, and Comment in 44 Yale L.J. 318. In *Dimick v. Scheidt,* 293 U.S. 474, the Supreme Court, in an opinion by Mr. Justice Sutherland, held that under the federal practice an additur was not proper. There was a vigorous dissent by Mr. Justice Stone, concurred in by Chief Justice Hughes, and Justices Brandeis and Cardozo. It seems to have been agreed by all the Justices, however, that the long established practice of remittitur did not impair the right to trial by jury under the seventh amendment. See the note on this case in 21 Va. L. Rev. 666. See also 39 Am. Jur., *New Trial,* Sec. 213, and notes 53 A.L.R. 779; 95 A.L.R. 1163. We find it unnecessary to review in detail the authorities cited in the *Dimick* case in support of the proposition. We find no violation of the plaintiffs' constitutional rights in the instant case." (221 Md. at 503, 158 A. 2d at 130)

The Conklins seek to weaken the *Turner* decision by indicating in their brief and at the argument that the constitutional point was not argued in the trial court and no authorities were cited in the briefs of either party either *pro* or *con* on the constitutional point. This Court, however, stated:

> "For the present purposes, however, we will assume that the point is jurisdictional and properly before us." (221 Md. at 502-503, 158 A. 2d at 130)

The trial court, however, need not provide for a remittitur in a case involving an excessive verdict but may, in its discretion, proceed to grant a new trial for this reason and this action is not reviewable by us unless the trial court abused its discretion.

Thirdly, we find the decisions in the Federal Courts persuasive. The federal decisions (as well as the State decisions) are carefully and fully reviewed in the excellent opinion of Circuit Judge Medina in *Dagnello v. Long Island Railroad Co.*, 289 F. 2d 797 (CA 2—1961), *supra.* In *Dagnello,* a tort case in which the jury's verdict was for $97,000 for the loss of the left leg and attendant pain and suffering and claimed to be excessive, the trial court declined to grant a remittitur or a new trial for this reason. The defendant appealed claiming an abuse of discretion in the refusal to grant a remittitur or a new trial. On the appeal, the appellee argued that the trial court had no *power* to enter a remittitur or, if no remittitur were filed, to grant a new trial solely because of an excessive verdict as this would violate the provisions of the Seventh Amendment to the Constitution of the United States, adopted in 1791, which provides:

> "In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise reexamined in any Court of the United States,

than according to the rules of the common law." [1]

After a comprehensive review of the cases in the Supreme Court of the United States and in the Federal Circuits, Judge Medina concluded that they indicate that the power to grant new trials solely on the ground of an excessive verdict exists. In regard to the constitutional question under the Seventh Amendment, Judge Medina, for the Second Circuit, stated:

"From the very early days of the Republic trial judges seem to have assumed they had power to set aside verdicts and grant new trials on the sole ground that they were excessive, despite the fact that common law trial judges in England, prior to the adoption of the Seventh Amendment in 1791, exercised no such power, as motions for new trials were not addressed to the trial judges. And it must be borne in mind that the federal as well as the state judges in 1791 were familiar with English and Colonial precedents. So far as we are aware, the first occasion for authoritative comment to serve as a precedent arose in 1822 when Mr. Justice Story, sitting on circuit, authorized a remittitur in Blunt v. Little, Fed.Cas.No.1,578, 3 Mason 102. From that time to this, federal trial judges have had the unchallenged power to set aside verdicts as excessive and grant new trials, and they have also exercised the salutary power to deny the motion for a new trial provided plaintiff accepted a reduced amount of recovery on remittitur. Until the landmark case of Dimick v. Schiedt, 1935, 293 U.S. 474, 55 S.Ct. 296, 79 L.Ed. 603, involving the question of whether additur was permissible, there appears to have been no extended research into the practices and

1. There is no comparable specific limitation upon re-examination of a fact tried by a jury in the Maryland Constitution.

procedures of the English courts at the time
the Seventh Amendment was adopted in 1791."
(289 F. 2d 802-803)

Fourthly, and finally, we do not agree with the contention of the Conklins that the trial courts of Maryland have no power to grant new trials in tort cases solely on the ground of an excessive jury verdict, because the great weight of authority in our sister States indicates the contrary. Note 1 in the *Dagnello* opinion reviews the authorities in the State Courts and concludes that, "In all but three of the fifty states either the highest court in the state or an intermediate appellate court has some power to review the size of a verdict for excessiveness." It would unduly prolong this opinion to consider the state cases in detail. We note that our neighboring States of Pennsylvania (see *Glaister v. Eazor Express, Inc.*, 390 Pa. 485, 136 A. 2d 97 (1957)), Virginia (see *Danville Community Hospital, Inc. v. Thompson*, 186 Va. 746, 43 S.E.2d 882, 173 A.L.R. 525 (1947)), and Delaware (see *Bennett v. Barber*, 7 Terry 132, 46 Del. 132, 79 A. 2d 363 (1951)) follow the great weight of authority as well as the remaining original thirteen States of Connecticut, Georgia, Massachusetts, New Hampshire, New York, North Carolina, Rhode Island, and South Carolina.

### 2.

The Conklins further contend that if it be assumed for the argument (and as we have held) that the trial Courts of Maryland have power to grant new trials in tort cases solely on the ground of an excessive verdict, an abuse of the discretion of the trial court in the exercise of that power may be reviewed by this Court, and that in this case there was an abuse of discretion by the trial court. We agree that an abuse of discretion may be reviewed by us "under extraordinary circumstances" — See *State, Use of Shipley v. Walker*, 230 Md. 133, 186 A. 2d 472 (1962)—but we do not agree with the contention that the trial court abused its discretion in this case.

In *Dagnello*, Judge Medina summarized the various

formulae used in the Federal Circuits to implement the exercise of the power to grant the new trial for excessive verdicts. He stated, for the Second Circuit:

> "We need not pause to consider in detail the rules formulated in the various Circuits to implement the exercise of the power of review. That there is, at least on the surface, a wide difference of opinion need not surprise us. Common phrases are such as: 'grossly excessive,' 'inordinate,' 'shocking to the judicial conscience,' 'outrageously excessive,' 'so large as to shock the conscience of the court,' 'monstrous,' and many others." (289 F. 2d 802)

In Maryland we have held it is for the trial judge to determine whether a verdict "shocked his conscience," *Safeway Trails, Inc. v. Smith,* 222 Md. 206, 223, 159 A. 2d 823, 833 (1960), was "grossly excessive," *Brawner v. Hooper,* 151 Md. 579, 595, 135 A. 420, 427 (1926) or merely "excessive," *State, Use of Shipley v. Walker,* 230 Md. 133, 137, 186 A. 2d 472, 474 (1962), *supra.* As Judge Medina points out in *Dagnello, supra,* all of these formulae mean substantially the same thing, the adjectives or picturesque articulations as in *Beardmore v. Carrington, supra* that the damages are "such as all mankind must be ready to exclaim against, at first blush," being used to indicate the trial judge should extend the fullest consideration possible to the amount returned by the jury before it concludes that it shocks his conscience, is "grossly excessive" or is "excessive." In reviewing the exercise by the trial court in granting a new trial in a tort case because of an excessive verdict, we will only review the trial court's action "under extraordinary circumstances," *State, Use of Shipley v. Walker, supra* (230 Md. at 137, 186 A. 2d at 474).

Our review of the record in the present case does not indicate to us that the trial court abused its discretion. In granting the new trial because of the excessiveness of the verdict, the trial court was of the opinion that the size

of the $100,000 verdict was "founded upon passion" and was "so excessive as to shock the conscience of the Court." Even though Mrs. Conklin was painfully injured as a result of the accident, fortunately most of her injuries responded to treatment and did not result in extensive permanent injury. She was in the hospital for one week and was out of work for only one month. Her claim for special damages for lost wages was $599.38. All other damages, including claims for loss of consortium and for injuries to the husband resulted in three jury verdicts amounting to $10,000 in the aggregate, and this amount apparently has been paid. After leaving the hospital on or about February 1, 1966, she was treated on an out-patient basis at the Bethesda Naval Hospital, receiving six treatments beginning February 17, 1966, and extending into March 1966. After being referred to Dr. Van Herpe, Mrs. Conklin incurred a bill of $335 to him for 16 dates of treatment and prior to that referral, she had incurred medical expenses of $1,618.74. Under these facts and circumstances, we cannot find that the trial court abused its discretion in granting a new trial because the verdict was excessive.

### 3.

The third and final contention made by the Conklins is that the trial court "erred in ruling that the case of *Davis v. Gordon* [183 Md. 129, 36 A. 2d 699 (1944)], precluded an award of punitive damages under the circumstances of this case." They argue that Count One of the Amended Declaration averred facts sufficient to allege a cause of action for the allowance of punitive damages but that the trial court sustained a demurrer to this Count, without leave to amend and further stated in its opinion granting the new trial on Count Five that the "jury was, in effect, attempting to punish the defendant because of the gross[ly] negligent manner that caused this accident." They further contend that *Davis*, as properly interpreted and reconciled with prior and subsequent cases in this Court as well as with the rule in re-

gard to punitive damages set forth in *Restatement (Second) Torts,* Sections 500-501, does not support the action of the trial court and if we construe that decision as prohibiting the recovery of punitive damages in this type of personal injury case, we should now overrule the decision in the *Davis* case.

The Conklins state in their brief: "that *Davis v. Gordon* does not hold that punitive damages may be recoverable only if the defendant intentionally injures a victim with his automobile, but instead allows punitive damages when an automobile driver causes injury by his intentional disregard of his duty of due care for the safety of others."

We think it is clear that none of the decisions in this Court has held that in *no conceivable set of facts* there may not be a recovery of punitive damages in a tort case seeking damages for personal injuries resulting from the use of automobiles, and the opinion in *Davis* suggests that there may be recovery of punitive damages in the event of an intentional, malicious injury in automobile cases. The difficulty in the Maryland cases arises in regard to factual situations in which there is no evidence of *actual intent* to injure or of *actual malice* toward the injured person, but in which the defendant's conduct is of such an extraordinary character as possibly to be the legal equivalent of such actual intent or actual malice, sometimes described as "wanton," "reckless disregard of the rights of others," and the like. We rather agree that in this latter type of situation, the language of some of the Maryland cases needs further interpretation and possible reconsideration to reach a more clear-cut rule, but unfortunately the present case is not one in which we can accomplish this desirable result in that (a) the issue is not properly before us on appeal and (b) even assuming, *arguendo,* that the interpretation of the applicants is the correct one, the facts in the instant case would not, in our opinion, justify a submission of the issue of punitive damages to the jury.

72

(a)

Count One of the Original Declaration provided, as follows:

"On or about January 22, 1966, on Maryland Route 450, a public highway in Prince George's County, Maryland, approximately 683 feet east of Race Track Road, near Bowie, Maryland, Defendant Charles Henry Schillinger with gross negligence and wanton disregard for the life and property of others drove his automobile east on Maryland Route 450 on the wrong side of the road, which was controlled by a center stripe, as he approached the crest of a hill and collided head-on with the vehicle driven west on Maryland Route 450 by Plaintiff Alfred R. Conklin, while exercising due care, with his wife, Plaintiff Annette J. Conklin, was a passenger who was exercising due care. As a result of Defendant's wrongful actions, Plaintiffs suffered serious and permanent injuries, both physical and mental.

"WHEREFORE, On account of the premises, Plaintiffs sue Defendant for One Hundred Thousand Dollars ($100,000.00) exemplary damages and costs of this suit."

To this Count One, the defendant demurred in that it "is bad in substance and insufficient at law because it fails to state a cause of action in the plaintiffs against the defendant, because it is duplicitous in combining the claims of the two plaintiffs in one count, and because it seeks exemplary damages but the facts alleged would not entitle the plaintiffs to exemplary damages." The "Points" were "As above stated" and the "Authorities" consisted of one case "183 Md. 129, (1944), *Davis v. Gordon.*"

Our review of the docket entries in the instant case does not disclose that judgment was ever entered for the defendant Schillinger on Count One of either the Origi-

nal Declaration filed February 25, 1966, or of the Amended Declaration filed July 7, 1967. The docket entries do indicate that on May 2, 1966, the trial court sustained the defendant's demurrer to Count One of the Original Declaration "without leave to amend," but there was no entry of judgment for the defendant on that Count. Later on July 7, 1967, the plaintiffs Conklin filed a motion for leave to file an Amended Declaration which recited as grounds that they desired to amend Counts Two, Four and Five in certain regards upon which motion the lower court passed an Order, also on July 7, 1967, granting the motion and providing that "the original of the proposed Amended Declaration, filed as an Exhibit to the said Motion, be filed by the Clerk as the Amended Declaration in this case." Pursuant to this Order, the Clerk filed the Amended Declaration mentioned which contained *five separate Counts*, Counts One and Three being the same as the same numbered Counts in the Original Declaration and Counts, Two, Four and Five containing the changes set forth in the Motion for Leave to Amend. The defendant did not demur to Count One or to any of the other Counts in the Amended Declaration and filed no pleas to any of those Counts. The issues were presented to the jury on a sheet of paper as follows:

"1. Count by Mr. Conklin for property damage and medical and hospital expenses $ . ..
2. Count by Mr. Conklin for Injuries $ . .
3. Count by both for injury to marriage relationship $ ..
4. Count by Mrs. Conklin for her injury and loss of time from work $ . . ..."

In the blanks indicated appear the figures $2,700, $2,-300, $5,000 and $100,000 respectively. On the sheet, in pencil, appear the words "Jury Copy" and, also, in pencil, opposite the typed numbers 1, 2, 3 and 4, appear the numbers 2, 3, 4 and 5, the pencil items apparently being written on the sheet by the Clerk, the numbers written in pencil probably indicating the numbers of the Counts

in the Amended Declaration. In any event, the docket entries on July 14, 1967, indicate that the case was:

> "Submitted to the Jury on the following:
>
> 2. Count by Mrs. Conklin for property damages and medical and hospital expenses $2,700.00
> 3. Count by Mr. Conklin for injuries $2,300.00
> 4. Count by both for injury to marriage relationship $5,000.00
> 5. Count by Mrs. Conklin for her injury and loss of time from work $100,000.00·
>
> 1967, July 19th Motion for Partial New Trial and Memorandum of Points and Authorities, filed."

The docket entries then indicate the filing of a Memorandum and Authorities in Opposition to the Motion for a New Trial, the argument on the motion, which was taken under advisement by the trial court and then—

> "1967, August 21st Opinion and Order of Court (Judge Roscoe H. Parker), filed."

The Order of August 21, 1967, was the order granting the new trial on Count Five, already mentioned.

The Plaintiffs Conklin then entered an appeal on September 20, 1967, to this Court "from the judgment entered in this action on Count One and Count Five on August 21, 1967."

We dismissed this appeal upon the motion of the defendant, the mandate being received in the lower court on March 11, 1968. Thereafter the case went forward on Count Five before Judge Mathias and a jury and resulted in a verdict by the jury for $25,000.00. The docket entries then show under date of July 9, 1968, "Judgment nisi entered in favor of the" plaintiffs against the defendant in the amount of $25,000.00 "with interest from date and costs." This judgment nisi was made absolute on July 12, 1968, and an appeal to this Court from that judgment was entered by the Conklins on August 2, 1968.

It will be noted that Count One of the Amended Dec-

laration was not presented for the consideration of the jury and that no judgment on that Count or indeed on Counts Two, Three and Four were ever entered, either nisi or absolute. Counsel for the plaintiffs most likely thought that Count One had already been disposed of by the lower Court's sustaining of the demurrer to Count One of the Original Declaration, without leave to amend and that this ruling would be available for appeal by entry of judgment for the defendant on Count One as and when there was an appealable final judgment in the case. As we have seen, however, there never has been a judgment entered in the case on Count One, Maryland Rule 345 e which provides that an order "sustaining a demurrer to the *entire declaration,* without leave to amend, shall be deemed to include and constitute a final judgment for costs for the demurring party" (emphasis supplied) not being applicable when the demurrer is sustained to One Count in the declaration which, of course, is obviously less than the *entire declaration.* The lower court *could* have directed the entry of final judgment for the defendant on Count One of the Original Declaration under Rule 605 a upon making the express declarations, required under that rule—see *Parish v. Milk Producers Association,* 250 Md. 24 at 98, 242 A. 2d 512 at 553 (1968), but this was not done—properly, in our opinion, —in view of the policy against piecemeal appeals.

Not only was no judgment entered on Count One, but when the plaintiffs Conklin filed their Amended Declaration covering all Five Counts in the Original Declaration, this resulted in a withdrawal of the Original Declaration. Our predecessors in *Commissioners of Aberdeen v. Bradford,* 94 Md. 670, 677-78, 51 A. 614 summarized the Maryland Law in this regard as follows:

> "The original *narr.* contained but one count; subsequently a second was added; and during the trial on leave of the Court, an amended *narr.* was filed. As appears by the record the leave was asked and granted, not to amend by

76

filing an additional count, but only to 'file amended *narr.*' In such case the original *narr.* must be held to be withdrawn. *Mitchell v. Williamson,* 9 Gill, 77 ; *Poe's Practice,* sec. 189."

See also *Mayor & City Council of Baltimore v. Maryland Pavement Co.,* 130 Md. 454 at 459, 100 A. 770, 772 (1917). Under these circumstances, when the plaintiffs filed their Amended Declaration, with the consent of the defendant, the Original Declaration was withdrawn and with it, the lower court's ruling on the demurrer to the first count, and, *so far as the pleadings were concerned,* Count One in the Amended Declaration was one of the counts which could still be considered in the case, the defendant not having demurred to that count in the Amended Declaration. The obligation was then upon the plaintiffs to request an instruction to the jury on the question of punitive damages but they did not do this most likely because their counsel thought such a request would be refused in view of the prior ruling and might have an adverse psychological effect on the jury when it considered the question of compensatory damages. In any event no such request was made by the plaintiffs and they, of course, took no exception to the trial court's charge for not having given such an instruction. Thus, under Rule 554 d, the issue in regard to punitive damages either on the pleadings or on the merits, was not preserved for appellate review.

b.

Even if the issue were properly before us for consideration, and assuming, for the argument, but without deciding, that the interpretation of the appellants in regard to the Maryland law relative to punitive damages in automobile accident cases is the correct one, in our opinion, there were not sufficient facts in the present case which would have justified the trial court in submitting the issue of punitive damages to the jury.

Although the evidence most favorable to the plaintiffs indicates that the action of the defendant in pulling over

on the left side of the road was a negligent act, that evidence does not, in our opinion, indicate that the act was of such a character that it could be said to be an "intentional disregard of his duty of due care for the safety of others." On the contrary, the testimony of the defendant is uncontroverted that for some 20 years he had attended the races at the Bowie track and that without exception the road in question had been made, by the action of the traffic officer, a one-way road to accommodate the traffic from the track at the end of the races. This general practice was corroborated by the traffic officers who testified for the plaintiffs and indeed they testified that earlier on the day of the accident they had directed traffic one-way. It was because of his belief that the usual policy was in effect that he pulled out into the left-hand lane and proceeded up the hill at "possibly forty miles" per hour according to the estimate of the plaintiffs' witness Funk (The defendant estimates his speed at 25 to 30 miles per hour.). The defendant testified that he did not see any officer directing traffic into the right lane and there was no definite proof that he did, the only evidence being that 10 minutes prior to the accident, a traffic officer was "waving traffic" into the right lane. It is uncontradicted that the defendant had his father-in-law in the front seat with him and his sister-in-law in the rear seat. There was no evidence that the defendant had been drinking or was not in full control of his automobile. Under these facts and reasonable inferences from those facts, in our opinion, a jury could not properly find that the defendant had been guilty of an "intentional disregard of his duty of due care for the safety of others." Accordingly if the plaintiffs had requested an instruction by the trial court on the question of punitive damages, the trial court, in our opinion, should have directed the jury that under the evidence in the case, the plaintiffs were not entitled to punitive damages.

*Judgment affirmed, the appellants to pay the costs.*