**Albert SNYDER, Plaintiff,**

v.

**Fred W. PHELPS, Sr., et al., Defendants.**

**Civil Action No. RDB–06–1389.**

United States District Court, D. Maryland.

Feb. 4, 2008.

---

Paul W. Minnich, Sean E. Summers, Barley Snyder LLC, Craig Tod Trebilcock, Shumaker Williams PC, York, PA, for Plaintiff.

Jonathan Lawrence Katz, Marks and Katz LLC, Silver Spring, MD, for Fred W. Phelps, Sr. and Westboro Baptist Church, Inc.

Shirley L. Phelps–Roper, Topeka, KS, pro se.

Rebekah A. Phelps–Davis, Topeka, KS, pro se.

### *MEMORANDUM OPINION*

RICHARD D. BENNETT, District Judge.

On October 31, 2007, a jury awarded $10.9 million in compensatory and punitive damages to the Plaintiff, Albert Snyder ("Plaintiff" or "Snyder"), for acts of intentional infliction of mental and emotional distress, invasion of privacy by intrusion upon seclusion, and conspiracy to commit these acts by the Defendants, Fred W. Phelps, Sr. ("Phelps"), Shirley L. Phelps–Roper ("Phelps–Roper"), Rebekah A. Phelps–Davis ("Phelps–Davis"), and Westboro Baptist Church, Inc. (collectively, "Defendants"). These acts occurred before, during, and after the March 10, 2006 funeral of Snyder's son, Marine Lance Corporal Matthew A. Snyder, who was killed in the line of duty in Iraq.

The funeral was conducted at St. John's Catholic Church in Westminster, Maryland. Defendants' acts included picketing as members of the Westboro Baptist Church and carrying signs that Defendants contend simply expressed their reli-

gious points of view. The signs expressed general points of view such as "America is doomed" and "God hates America." However, the signs also expressed more particularized messages, to wit: "You are going to hell," "God hates you," "Thank God for dead soldiers," and "Semper fi fags." Defendants' acts also included posting an "epic" entitled "The Burden of Marine Lance Cpl. Matthew Snyder" on the church's website, www.godhatesfags.com, in the weeks following the funeral. The publication on the church's website of "The Burden of Marine Lance Cpl. Matthew Snyder" expressed Defendants' view that Lance Cpl. Snyder had been "raised for the devil" and "taught to defy God." It was undisputed at trial that Defendants had never met Matthew Snyder or any members of his family.

In pre-trial motions, motions during trial, and post-trial motions, Defendants have contended that their actions and expressions were absolutely protected by the First Amendment to the United States Constitution, which provides that "Congress shall make no law ... prohibiting the free exercise [of religion]; or abridging the freedom of speech...."[1] This Court has held and continues to hold that the First Amendment does not afford absolute protection to individuals committing acts directed at other private individuals. The Supreme Court of the United States has specifically held that First Amendment protection of particular types of speech must be balanced against a state's interest in protecting its residents from wrongful injury. *Gertz v. Robert Welch Inc.*, 418 U.S. 323, 342–43, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). Maryland particularly recognizes a cause of action protecting its residents from intentional infliction of emo-

tional distress arising from outrageous conduct. Maryland also recognizes a cause of action for invasion of privacy by intrusion upon seclusion when there is an unwarranted invasion of a person's privacy which would be highly offensive to a reasonable person.

Accordingly, this case proceeded to trial before a jury on October 22, 2007 on three counts—intrusion upon seclusion, intentional infliction of emotional distress, and civil conspiracy.[2] In rendering its $10.9 million verdict for Plaintiff, the jury found that Defendants' conduct was outrageous, causing severe emotional distress to the Plaintiff, and that there was an unwarranted invasion of privacy highly offensive to a reasonable person.

Defendants have filed post-trial motions for Judgment as a Matter of Law, Judgment Notwithstanding the Verdict, Reconsideration and Rehearing, New Trial, Relief from Judgment, and Relief of Law and Equity. The issues have been fully briefed and there is no need for a hearing. *See* Local Rule 105.6 (D.Md.2008). For the reasons that follow, these motions are DENIED. There was also more than sufficient evidence to support the jury's verdict on Defendants' liability. There was more than sufficient evidence to support the jury's verdict that Defendants' conduct before, during, and after the funeral of Matthew Snyder was outrageous, designed to inflict emotional distress upon Plaintiff, and that the intrusion upon the seclusion of Plaintiff and his family was highly offensive to a reasonable person.

Defendants have also moved for *remittitur*, contending that the jury's verdict was grossly excessive. For the reasons that follow, the Motions for *Remittitur* are DENIED in part and GRANTED in part.

---

**1.** U.S. Const. amend. I.

**2.** All parties requested a jury trial in this matter. This Court granted Defendants' mo-

tions for summary judgment on two of the five original claims. *See* discussion *infra* pages 572–73.

Applying state common law standards, this Court upholds the verdict of the jury and the compensatory damage award of $2.9 million. However, under both federal constitutional and state common law standards, this Court reduces the total punitive damages award against all Defendants to $2.1 million.[3] Accordingly, the total award of damages in this case is reduced to $5 million.

Defendants have also filed Motions to Stay the execution of the judgment. Those motions remain pending before this Court until a determination of the security to be provided by Defendants for the revised judgment in this case has been made.

## BACKGROUND AND PROCEDURAL HISTORY

The facts of this case as presented at trial were largely undisputed. On March 3, 2006, Marine Lance Corporal Matthew A. Snyder was killed in Iraq in the line of duty. Shortly thereafter, two United States Marines came to the home of the Plaintiff, Albert Snyder, and told him that his son had died. As Matthew Snyder had lived in Westminster, Maryland, and graduated from Westminster High School, St. John's Catholic Church in Westminster was selected as the site for his funeral, which was scheduled for March 10, 2006. Obituary notices were placed in local newspapers providing notice of the time and location of the funeral.

Defendant Fred W. Phelps, Sr., founded Defendant Westboro Baptist Church, Inc. in Topeka, Kansas, in 1955. For fifty-two years, he has been the only pastor of the church, which has approximately sixty or seventy members, fifty of whom are his children, grandchildren, or in-laws. Among these family members are Defendants Shirley L. Phelps–Roper and Rebekah A. Phelps–Davis. There are approximately ten to twenty members of the church who are not related to Phelps by blood or marriage. According to the testimony of Defendants' expert, the members of this church practice a "fire and brimstone" fundamentalist religious faith. Among their religious beliefs is that God hates homosexuality and hates and punishes America for its tolerance of homosexuality, particularly in the United States military. Members of the church have increasingly picketed funerals to assert these beliefs. Defendants have also established a website identified as www.godhatesfags.com in order to publicize their religious viewpoint.

Defendants' testimony at trial established that their picketing efforts gained increased attention when they began to picket funerals of soldiers killed in recent years. Members of the Phelps family prepare signs at an on-site sign shop at their Kansas church to take with them in their travels. They also utilize an on-site production facility to produce videos displayed on the church's website.

Phelps testified that members of the Westboro Baptist Church learned of Lance Cpl. Snyder's funeral and issued a news release on March 8, 2006, announcing that members of the Phelps family intended to come to Westminster, Maryland, and picket the funeral. On March 10, 2006, Phelps, his daughters Phelps–Roper and Phelps–Davis, and four of his grandchildren arrived in Westminster, Maryland, to picket Matthew Snyder's funeral. None of the Defendants ever met any members of the Snyder family.

Defendants' rationale was quite simple. They traveled to Matthew Snyder's funeral

---

**3.** The $2.1 million punitive damages award is apportioned as follows: $1 million against the Defendant Westboro Baptist Church, Inc., $600,000 against Defendant Shirley L. Phelps–Roper, $300,000 against Defendant Fred W. Phelps, Sr., and $200,000 against Defendant Rebekah A. Phelps–Davis.

in order to publicize their message of God's hatred of America for its tolerance of homosexuality. In Plaintiff's eyes, Defendants turned the funeral for his son into a "media circus for their benefit." By notifying police officials in advance, Defendants recognized that there would be a reaction in the community. They carried signs which expressed general messages such as "God Hates the USA," "America is doomed," "Pope in hell," and "Fag troops." The signs also carried more specific messages, to wit: "You're going to hell," "God hates you," "Semper fi fags," and "Thank God for dead soldiers." Phelps testified that it was Defendants' "duty" to deliver the message "whether they want to hear it or not." Lance Cpl. Snyder's funeral was thus utilized by Defendants as the vehicle for this message.

It was undisputed at trial that Defendants complied with local ordinances and police directions with respect to being a certain distance from the church. Furthermore, it was established at trial that Snyder did not actually see the signs until he saw a television program later that day with footage of the Phelps family at his son's funeral.

Defendants' utilization of Matthew Snyder's funeral to publicize their message continued after the actual funeral on March 10, 2006. After returning to Kansas, Phelps–Roper published an "epic" on the church's website, www.godhatesfags.com. In "The Burden of Marine Lance Cpl. Matthew Snyder" (Pl.'s Trial Ex. 20), Phelps–Roper stated that Albert Snyder and his ex-wife "taught Matthew to defy his creator," "raised him for the devil," and "taught him that God was a liar." In the aftermath of his son's funeral, Snyder learned that there was reference to his son on the Internet after running a search on Google. Through the use of that search engine, he read Phelps–Roper's "epic" on the church's website.

Snyder testified at length about his emotional and physical reaction not only to the demonstration at his son's funeral but also to the publication of the "epic" on the Internet. He specifically testified that he "threw up" and "cried for about three hours" after viewing the "epic" approximately four to five weeks after his son's funeral. He also presented expert testimony with respect to the effect that Defendants' actions had and continue to have on him.

On June 5, 2006, Albert Snyder filed this case against Fred W. Phelps, Sr. and the Westboro Baptist Church, Inc. (the "church Defendants"). Shirley L. Phelps–Roper and Rebekah A. Phelps–Davis (the "*pro se* Defendants") were added as Defendants on February 23, 2007. Jurisdiction of this Court was based on the diversity of citizenship of the parties pursuant to 28 U.S.C. § 1332. Snyder originally brought five counts against Defendants— defamation, intrusion upon seclusion, publicity given to private life, intentional infliction of emotional distress, and civil conspiracy. After hearing oral arguments on October 15, 2007, this Court granted Defendants' motions for summary judgment as to the defamation and publicity given to private life claims.

As to the defamation count, this Court noted at the hearing that, pursuant to *Samuels v. Tschechtelin*, 135 Md.App. 483, 763 A.2d 209, 241–42 (Md.Ct. Spec.App.2000), the elements of a defamation claim under Maryland law include (1) that Defendants made a defamatory communication to a third person, (2) that the statement was false, (3) that Defendants were at fault in communicating the statement, and (4) that Plaintiff suffered harm. This Court held that the first element, a defamatory communication, was not satisfied because the content of the "epic" posted on the church's website was essentially

Phelps–Roper's religious opinion and would not realistically tend to expose Snyder to public hatred or scorn. Accordingly, Defendants' motions for summary judgment were granted as to the defamation claim.

As to the publicity given to private life claim, this Court cited *Furman v. Sheppard*, 130 Md.App. 67, 744 A.2d 583, 588 (Md.Ct.Spec.App.2000), pursuant to which Plaintiff would have to prove that Defendants gave publicity to a matter concerning his private life and that the matter publicized was of a kind which (a) would be highly offensive to a reasonable person and (b) is not of legitimate concern to the public. This Court held that no private information was made public by Defendants. Defendants learned that Snyder was divorced and that his son was Catholic from the obituary in the newspaper. In addition, any publication of this information would not be highly offensive to a reasonable person as it was already a matter of public record. Accordingly, this Court granted Defendants' motions for summary judgment as to the publicity given to private life claim.

This Court held, however, that the remaining three claims—intrusion upon seclusion, intentional infliction of emotional distress, and civil conspiracy—raised genuine issues of material fact to be determined by a jury. Accordingly, the case was tried before a jury from October 22, 2007 to October 30, 2007. On October 31, 2007, the jury returned a verdict in favor of Plaintiff and against all four Defendants on the three claims, awarding compensatory damages of $2.9 million. After hearing additional instructions and arguments, the jury awarded Plaintiff $8 million in punitive damages—$6 million for the invasion of privacy claim and $2 million for the intentional infliction of emotional distress claim.[4] Judgment was entered by this Court on November 2, 2007. (Paper No. 208.)

On November 8, 2007, *pro se* Defendants Phelps–Roper and Phelps–Davis filed (1) a Motion for Judgment as a Matter of Law, Motion for Judgment Notwithstanding the Verdict, Motion for Reconsideration and Rehearing, Motion to Alter or Amend the Judgment, Motion for New Trial and/or *Remittitur*, Motion for Relief from Judgment, Motion for Any Other Relief in Law and Equity Warranted under the Facts and Law (Paper No. 211), and (2) a Motion for Stay (Paper No. 212). On November 14, 2007, the church Defendants Phelps and Westboro Baptist Church, filed (1) a Motion for Stay (Paper No. 214), and (2) a Motion for Judgment as a Matter of Law, Motion for Judgment Notwithstanding the Verdict, Motion for Reconsideration and Rehearing, Motion to Alter or Amend the Judgment, Motion for New Trial and/or *Remittitur*, Motion for Relief from Judgment, Motion for Any Other Relief in Law and Equity Warranted under the Facts and Law (Paper No. 215).

## STANDARDS OF REVIEW

### I. Motion for Judgment as a Matter of Law & Judgment Notwithstanding the Verdict

First, Defendants move for judgment as a matter of law and for a judgment notwithstanding the verdict pursuant to Rule 50 of the Federal Rules of Civil Procedure.[5] Pursuant to Rule 50(b), "a district

---

4. Specifically, as to the invasion of privacy count, the jury awarded $1.5 million against Westboro Baptist Church, $1.5 million against Fred W. Phelps, Sr., $1.5 million against Shirley L. Phelps–Roper, and $1.5 million against Rebekah A. Phelps–Davis. As to the intentional infliction of emotional distress count, the jury awarded $500,000 against each of the four Defendants.

5. This Court notes that the Federal Rules of Civil Procedure were amended on December

court may grant JNOV 'if there is no legally sufficient evidentiary basis for a reasonable jury to find for the [non-moving] party....'" *Cline v. Wal–Mart Stores,* 144 F.3d 294, 301 (4th Cir.1998) (citation omitted); *see also Gibson v. Old Town Trolley Tours,* 160 F.3d 177, 181 (4th Cir.1998). The standard for granting judgment as a matter of law both during and after trial is the same. *See Adkins v. Crown Auto, Inc.,* 488 F.3d 225, 231 (4th Cir.2007).

## II. Motion to Amend the Judgment & Motion for Reconsideration

Defendants also move to amend the judgment and for reconsideration pursuant to Rule 59(e).[6] Generally, "reconsideration of a judgment after its entry is an extraordinary remedy which should be used sparingly." *Pacific Ins. Co. v. Am. Nat'l Fire Ins. Co.,* 148 F.3d 396, 403 (4th Cir.1998). The United States Court of Appeals for the Fourth Circuit has identified three grounds for amending an earlier judgment: "(1) to accommodate an intervening change in controlling law; (2) to account for new evidence not available at trial; or (3) to correct a clear error of law or prevent manifest injustice." *Zinkand v. Brown,* 478 F.3d 634, 637 (4th Cir.2007) (internal citations omitted). The Fourth Circuit has cautioned that

> Rule 59(e) motions may not be used ... to raise arguments which could have been raised prior to the issuance of the judgment, nor may they be used to argue a case under a novel legal theory that the party had the ability to address

in the first instance. Similarly, if a party relies on newly discovered evidence in its Rule 59(e) motion, the party must produce a legitimate justification for not presenting the evidence during the earlier proceeding.

*Pacific Ins. Co.,* 148 F.3d at 403 (internal citations omitted).

## III. Motion for New Trial and/or *Remittitur*

Next, Defendants move for a new trial pursuant to Rule 59(a), which is a matter "resting in the sound discretion of the trial judge." *Eberhardt v. Integrated Design & Constr., Inc.,* 167 F.3d 861, 869 (4th Cir. 1999). A new trial should be granted "only if 1) the verdict is against the clear weight of the evidence, 2) is based on evidence which is false, or 3) will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict." *Dennis v. Columbia Colleton Med. Ctr., Inc.,* 290 F.3d 639, 650 (4th Cir.2002) (citations omitted). In considering a motion for a new trial, this Court "may weigh the evidence and consider the credibility of the witnesses." *Conner v. Schrader–Bridgeport Int'l, Inc.,* 227 F.3d 179, 200 (4th Cir.2000) (citing *Wyatt v. Interstate & Ocean Transport Co.,* 623 F.2d 888, 891 (4th Cir.1980)).

In addition to requesting a new trial based on the verdict, Defendants move for a new trial *remittitur,* a procedure that empowers this Court to grant Defendants' request for a new trial if Plaintiff refuses

---

1, 2007. However, none of the rules cited by the parties in this case were substantially changed by the amendments, however, which were "intended to be stylistic only." Fed. R.Civ.P. 62 advisory committee's note (rev. ed.2007).

**6.** The Defendants also cite Rule 52, pursuant to which the Court "may amend its findings

[of fact]—or make additional findings—and may amend the judgment accordingly." Fed. R.Civ.P. 52(b). However, Defendants' reliance on Rule 52 is misplaced, because that Rule applies to "actions tried upon the facts without a jury or with an advisory jury." In contrast, this case was tried before a jury, which returned a verdict on all three claims.

to accept a reduced monetary award. *Cline,* 144 F.3d at 305; *G.M. Garrett Realty v. Century 21,* 17 Fed.Appx. 169, 172 (4th Cir.2001) ("The federal courts have a long-standing practice of resolving excessive verdicts through conditioning the denial of a Rule 59 motion upon the acceptance by the plaintiff of a *remittitur* in a stated amount."); *see also* 12 James Wm. Moore *et al.,* Moore's Federal Practice § 59.13 *("Remittitur* is defined as the process by which a court compels a plaintiff to choose between the reduction of an excessive verdict and a new trial. If the plaintiff rejects the specified reduction in the amount of damages, the court must grant a new trial; the court does not have the option of entering judgment for the reduced amount without the plaintiff's consent."). This Court has an affirmative duty to order a new trial if the jury's damage award is excessive. *Cline,* 144 F.3d at 305.

Defendants also challenge the jury's punitive award on the grounds that it violates the Due Process Clause of the Fifth Amendment to the United States Constitution.[7] This Court's review of the punitive damages award under the Due Process Clause is procedurally different than a traditional *remittitur,* which requires offering a new trial to Plaintiff to comport with his right to a jury trial under the Seventh Amendment. To the extent that a reduction of punitive damages is based on constitutional safeguards, an option for a new trial is unwarranted. The United States Court of Appeals for the Eleventh Circuit has explained as follows:

> A constitutionally reduced verdict, therefore, is really not a *remittitur* at all. A *remittitur* is a substitution of the court's judgment for that of the jury regarding the appropriate award of damages. The court orders a *remittitur* when it believes the jury's award is un-

reasonable on the facts. A constitutional reduction, on the other hand, is a determination that the law does not permit the award. Unlike a *remittitur,* which is discretionary with the court and which we review for an abuse of discretion, *Gasperini,* 518 U.S. at 435, 116 S.Ct. 2211, a court has a mandatory duty to correct an unconstitutionally excessive verdict so that it conforms to the requirements of the due process clause. *[BMW of North America, Inc. v. Gore,* 517 U.S. 559, 585, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996).]

*Johansen v. Combustion Eng'g., Inc.,* 170 F.3d 1320, 1331 (11th Cir.1999) (emphasis omitted).

## IV. Motion for Relief

Next, Defendants move for relief from judgment pursuant to Rule 60 of the Federal Rules of Civil Procedure. Under that rule,

> the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons:
>
> (1) mistake, inadvertence, surprise, or excusable neglect;
>
> (2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b);
>
> (3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party;
>
> (4) the judgment is void;
>
> (5) the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or

7. U.S. Const. amend. V.

(6) any other reason that justifies relief.

Fed.R.Civ.P. 60(b). Granting a motion for relief is within the court's discretion. *Agostini v. Felton,* 521 U.S. 203, 238, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997).

## V. Motion to Stay

Finally, Defendants move for "a stay of the verdict and judgment in this case, in full, without requiring a bond, pending resolution of post-trial motions and all appeals." *(Pro se* Defs.' Mot. Stay 1; Church Defs.' Mot. Stay 1.) Rule 62(b) of the Federal Rules of Civil Procedure provides that "the court may stay the execution of a judgment—or any proceedings to enforce it—pending disposition" of motions made pursuant to Rules 50, 52(b), 59, and 60. If granting a motion to stay, the court must provide "appropriate terms for the opposing party's security." Fed.R.Civ.P. 62(b).[8] In addition, Rule 62(d) provides that "[i]f an appeal is taken, the appellant may obtain a stay by supersedeas bond" subject to the court's approval. Fed. R.Civ.P. 62(d).

## *ANALYSIS*

## I. Motion for Judgment as a Matter of Law & Judgment Notwithstanding the Verdict

First, Defendants move for judgment as a matter of law and for judgment notwithstanding the verdict pursuant to Rule 50 of the Federal Rules of Civil Procedure. At trial, Defendants moved for judgment as a matter of law after the presentation of Plaintiff's case, Defendants' case, and the conclusion of rebuttal testimony. Each motion was denied by this Court on the record. Thus, Defendants have renewed their motion. This Court finds that there was a legally sufficient evidentiary basis for the jury to find for Plaintiff on each of his three claims.

## A. The First Amendment Defense

As an initial matter, Defendants have repeatedly argued that their actions were entitled to absolute First Amendment protection. *(See, e.g., pro se* Defs.' Mem. Supp. Post-trial Mots. 2; Church Defs.' Mem. Supp. Post-trial Mots. 5.) Their defense implicates both the Free Exercise Clause and the Free Speech Clause of the First Amendment.[9] They once again argue in the pending motions that this lawsuit and the resulting jury verdict unconstitutionally restrict the *content* of their speech, which was in the form of signs and the "epic" entitled "The Burden of Marine Lance Cpl. Matthew Snyder" published on the church's website. They contend that their speech was purely religious in nature. However, the Supreme Court of the United States has long recognized that "not all speech is of equal First Amendment importance." *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.,* 472 U.S. 749, 758, 105 S.Ct. 2939, 86 L.Ed.2d 593 (1985). In *Dun & Bradstreet, Inc.,* the Supreme Court held that a private individual could recover damages under a common law defamation claim where the subject of the lawsuit was a matter of private

---

**8.** Rule 62 was one of the Federal Rules of Civil Procedure amended on December 1, 2007. The previous version of Rule 62(b), cited by the parties, was substantively the same, requiring "such conditions for the security of the adverse party as are proper...." Fed.R.Civ.P. 62(b) (2007).

**9.** The First Amendment of the United States Constitution provides, *inter alia,* that "Con- gress shall make no law ... prohibiting the free exercise [of religion]; or abridging the freedom of speech...." These restrictions have been extended to state governments through the Fourteenth Amendment. *See, e.g., McCreary County v. Am. Civil Liberties Union of Ky.,* 545 U.S. 844, 853 n. 3, 125 S.Ct. 2722, 162 L.Ed.2d 729 (2005); *Virginia v. Black,* 538 U.S. 343, 358, 123 S.Ct. 1536, 155 L.Ed.2d 535 (2003).

concern. *Id.* at 763, 105 S.Ct. 2939. The Supreme Court cited its previous opinion in *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), in which it held that the First Amendment interest in protecting speech must be balanced against a state's interest in protecting its residents from tortious injury. Quite simply, the Supreme Court has recognized that there is not an absolute First Amendment right for any and all speech directed by private individuals against other private individuals.

Recognizing the significance of the Supreme Court's holding that "not all speech is of equal First Amendment importance," *Dun & Bradstreet, Inc.,* 472 U.S. at 758, 105 S.Ct. 2939, Defendants argue that the funeral was both a matter of public concern and a public event. They further contend that Lance Cpl. Snyder became a public figure and his funeral became a public event when his father, Albert Snyder, filed a notice of the funeral in the obituary section of a local newspaper, and that both Plaintiff and his son were, therefore, public figures. Defendants' theory is that an individual becomes a public figure upon the filing of information in the obituary section of any newspaper.

■ This argument is without merit. The test for public figures was articulated by Justice Powell in *Gertz:*

> For the most part, ... [they] have assumed roles of especial prominence in the affairs of society. Some occupy positions of such persuasive power and influence that they are deemed public figures for all purposes. More commonly, those classed as public figures have thrust themselves to the forefront of particular public controversies in order

to influence the resolution of the issues involved. In either event, they invite attention and comment.

418 U.S. at 345, 94 S.Ct. 2997. The evidence in this case was quite clear that Albert Snyder did not "invite attention and comment" when he prepared a funeral for his son, but rather he intended for the funeral to be private.[10]

Indeed, the evidence in this case was undisputed that Defendants traveled to the funerals of young men such as Lance Cpl. Snyder so as to publicize their religious opinions and the alleged participation of homosexuals in the military. While earlier religious demonstrations had received little publicity, the demonstrations by the Westboro Baptist Church at the funerals of soldiers generated greater publicity. Phelps–Roper explained the usual *modus operandi* of her church as applied to Matthew Snyder's funeral. First, Defendants provided notice to law enforcement personnel in Westminster, Maryland of their intent to picket at Lance Cpl. Snyder's funeral. In light of past problems arising from the Westboro Baptist Church's demonstrations at military funerals, this notice necessarily resulted in increased police presence and media coverage at Lance Cpl. Snyder's funeral. Defendants cannot by their own actions transform a private funeral into a public event and then bootstrap their position by arguing that Matthew Snyder was a public figure.

By their own actions, Defendants also created an atmosphere of confrontation. This atmosphere was created by signs carrying both a general message as well as signs that could reasonably be interpreted as being directed at the Snyder family.

---

10. Defendants have consistently maintained that the funeral for Lance Cpl. Snyder was a public event because the obituary in the newspaper did not expressly limit the funeral to friends and family. However, both Plaintiff and Father Leo Patalinghug of St. John's Church, who presided over the funeral, testified that the funeral was intended to be private.

There were signs expressing general points of view such as "America is doomed" and "God hates America." However, there were also signs stating "Thank God for dead soldiers," "Semper fi fags," "You are going to hell," and "God hates you." While signs expressing general points of view are afforded First Amendment protection, these additional signs, which could be interpreted as being directed at the Snyder family, created issues for the finder of fact. Comments published on the church website stating that Matthew Snyder was raised for the devil and was taught to defy God created similar issues to be addressed by the finder of fact. The jury addressed these issues and determined that such comments on signs and on the website were so outrageous as to inflict severe emotional distress and invade the privacy of a private citizen during a time of bereavement.

Defendants alternatively argue that their comments and actions are protected by the Free Exercise Clause of the First Amendment. They contend that any comments and opinions expressed on signs or on their website were expressions of their fundamentalist religious beliefs.[11] It is indeed ironic that Defendants chose to publicize their fundamentalist beliefs at the funeral of a twenty-year-old Marine in the State of Maryland, which was founded on principles of religious tolerance.[12] Defendants presented a religious expert, Professor Randall Balmer, who offered testimony explaining the nature of the Defendants' "fire and brimstone" religious beliefs. Professor Balmer acknowledged in his testimony, however, that there was no Biblical or religious connection to Defendants' choice of demonstrations at military funerals. As previously noted, Defendants essentially acknowledged in their testimony that their choice of military funerals was driven by the publicity the demonstrations generated.

Defendants' First Amendment arguments place great emphasis on cases involving *statutory* restrictions. For example, the Supreme Court's opinion in *Church of the Lukumi Babalu Aye Inc. v. City of Hialeah,* 508 U.S. 520, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993), is of limited assistance to the Defendants. In that case, the Supreme Court held that a city

---

**11.** Consistent with this line of defense, counsel for Defendants Phelps and Westboro Baptist Church introduced into evidence a series of DVD video productions, which included "Thank God for 9/11," in which members of the Westboro Baptist Church celebrated the events of September 11, 2001 as a demonstration of God's hatred of America. *(See Defs.' Trial Exs. 41a-f.)* Counsel later apologized in his closing argument to the jury for the presentation of these videos.

**12.** *See* Charles A. Rees, *Remarkable Evolution: The Early Constitutional History of Maryland,* 36 U. Balt. L.Rev. 217, 229 (2007) (citation omitted). During Maryland's colonial era, "[r]eligious toleration between Catholics and Protestants was threatened by the rise of a fundamentalist puritanism." *Id.* (citation omitted). In response to such fundamentalism, the General Assembly of the Colony of Maryland passed the Act of Toleration in 1649, "a major step in the principle of freedom of religion in America." *Our Nation's Archive: The History of the United States in Documents* 53 (Erik Bruun & Jay Crosby, eds.1999). This act "has been called the first document (in the Anglo–American tradition) protecting the free exercise of religion." Rees, *supra,* at 229 (citing 1 *Archives of Maryland* 31 (William Hand Browne *et al.* eds., 1883–1947) and 1 Bernard Schwartz, *The Bill of Rights: A Documentary History* 67 (Leon Friedman ed., 1971)). "The success of religious toleration in Maryland served as a model for the nation a century later." *Our Nation's Archive, supra,* at 53. However, this freedom of religion was only accorded to those who believed in Jesus Christ and was therefore imperfect by modern standards. *See id.* at 53; David S. Bogen, *The Origins of Freedom of Speech and Press,* 42 Md. L.Rev. 429, 454 (1983).

ordinance that burdens a religious practice need not be justified by a compelling state interest if that ordinance is neutral and of general applicability. That opinion followed the Supreme Court's earlier opinion in *Employment Div., Dep't of Human Res. v. Smith,* 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990), in which the Supreme Court held that the State of Oregon could prohibit sacramental peyote use, consistent with the Free Exercise Clause of the First Amendment. In the opinion, Justice Scalia particularly noted that:

> We have never held that an individual's religious beliefs excuse him from compliance with an otherwise valid law prohibiting conduct that the State is free to regulate. On the contrary, the record of more than a century of our free exercise jurisprudence contradicts that proposition.

*Id.* at 878–79, 110 S.Ct. 1595.

Defendants can point to some successful attacks by the Westboro Baptist Church upon *statutory* restrictions which have been held not to meet these standards of neutrality and general applicability. For example, in *McQueary v. Stumbo,* 453 F.Supp.2d 975 (E.D.Ky.2006), the court addressed a statute which it found was "at least partially aimed at prohibiting members of the Westboro Baptist Church ... from protesting at funerals" as they engage "in a campaign against homosexuality." *Id.* at 983. The court granted a preliminary injunction to the plaintiff, holding that the provisions of the statute were not sufficiently narrowly tailored and that the provisions barring visual and auditory displays were unconstitutionally broad. To similar effect is the recent victory of Defendant Shirley L. Phelps–Roper in her appeal to the United States Court of Appeals for the Eighth Circuit in *Phelps–Roper v. Nixon,* 509 F.3d 480 (8th Cir.2007), in which the Eighth Circuit reversed the district court's denial of injunctive relief. In that case, a Missouri misde-

meanor statute criminalized picketing or other protest activities "in front of or about" a funeral location. The Eighth Circuit noted the overbreadth of the statute and held that Phelps–Roper had a fair chance of success on her claims that the criminal statute was not narrowly tailored and that the state's interest was outweighed by her First Amendment rights.

■ This case, however, does not involve a criminal statute. Nor does it involve any prohibition of Defendants' First Amendment rights of religious expression. Rather, this case involves balancing those rights with the rights of other private citizens to avoid being verbally assaulted by outrageous speech and comment during a time of bereavement. In *Cantwell v. Connecticut,* 310 U.S. 296, 303–04, 60 S.Ct. 900, 84 L.Ed. 1213 (1940), the Supreme Court held that freedom of religion "embraces two concepts,-freedom to believe and freedom to act. The first is absolute but, in the nature of things, the second cannot be." The Supreme Court reasoned that "[c]onduct remains subject to regulation for the protection of society." *Id.* at 304, 60 S.Ct. 900. Hence, an individual's First Amendment rights must be balanced against a state's interest in protecting its citizens. *Cf. Wisconsin v. Yoder,* 406 U.S. 205, 214, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972).

A state's interest in protecting its citizens is set forth not only in criminal statutes, but also by civil tort liability. *See generally* Alan Stephens, Annotation, *Free exercise of religion clause of First Amendment as defense to tort liability,* 93 A.L.R. Fed. 754 (1989). There is abundant case authority in which courts have balanced First Amendment rights with the imposition of tort liability based on the defendants' conduct in the exercise of those religious rights. For example, in *Guinn v. Church of Christ of Collinsville,* 775 P.2d

766 (Okla.1989), the court held that the conduct of church elders became "amenable to state regulation through the imposition of tort liability," including invasion of privacy and intentional infliction of emotional distress, after they revealed certain private facts about the plaintiff, a former parishioner of the church. *Id.* at 778. The court drew a distinction between the elders' acts taken while the plaintiff was a member of the church and those acts taken after she withdrew her membership, noting that the first acts were protected by the First Amendment while the latter acts were not. *Id.* at 779. The court held that "[n]o real freedom to choose religion would exist in this land if under the shield of the First Amendment religious institutions could impose their will on the unwilling and claim immunity from secular judicature for their tortious acts." *Id. See also Molko v. Holy Spirit Ass'n for the Unification of World Christianity,* 46 Cal.3d 1092, 252 Cal.Rptr. 122, 762 P.2d 46, 56–58 (1988) (holding that neither the United States Constitution nor the California Constitution banned traditional tort action against a church for fraud and misrepresentation).

### B. The Substantive Claims

As this Court's jurisdiction is based upon diversity of citizenship, *Erie* principles apply and this Court is guided by Maryland common law. *Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *see also Colgan Air, Inc. v. Raytheon Aircraft Co.,* 507 F.3d 270, 275 (4th Cir.2007).

### 1. Intentional Infliction of Emotional Distress

The tort of intentional infliction of emotional distress has been recognized in Maryland since 1977 when the Court of Special Appeals became "persuaded that the new tort, in a proper case, is viable in this State." *Jones v. Harris,* 35 Md.App. 556,

371 A.2d 1104, 1107 (Md.Ct.Spec.App.1977) (citing Restatement (Second) of Torts § 46 (1965)). On appeal, the Court of Appeals of Maryland ultimately reversed the intermediate appellate court's finding that there was sufficient evidence of severe emotional distress to submit the case to a jury, but affirmed the existence of a cause of action. *Harris v. Jones,* 281 Md. 560, 380 A.2d 611, 616 (1977). This Court has previously recognized that, in order to succeed on a claim for intentional infliction of emotional distress, a plaintiff must demonstrate that the "defendant[s], intentionally or recklessly, engaged in extreme and outrageous conduct that caused the plaintiff to suffer severe emotional distress." *Miller v. Bristol–Myers Squibb Co.,* 121 F.Supp.2d 831, 839 (D.Md.2000) (citing *Harris,* 380 A.2d at 614).

As to the intentional infliction of emotional distress claim in this case, Defendants contend that Plaintiff "did not show severe and specific injury as Maryland law requires." *(Pro se* Defs.' Mem. Supp. Post-trial Mots. 22.) They also argue that "the *only* way to satisfy the requirements of 'highly offensive' or 'extreme and outrageous' is to go to the content of religious speech." *(Id.* (emphasis in original).) Plaintiff's experts testified at trial that his depression and diabetes were exacerbated after the events of March 10, 2006, the date of his Matthew Snyder's funeral and Defendants' protest, and again after the publication of the "epic" concerning his son on the website. While the doctors concluded that it would be nearly impossible for Plaintiff to separate the emotional impact of Defendants' actions from preexisting conditions and from general grief over the loss of his son, they agreed that Defendants' actions had a significant impact. Thus, the jury had sufficient evidence before it to conclude that

Plaintiff suffered "severe and specific" injuries.

As to the issue of the content of the signs, this Court instructed the jury on the First Amendment, specifically the balance between Defendants' First Amendment rights and Maryland's interest in protecting its citizens from intentional infliction of emotional distress. There was sufficient evidence in the trial record for a reasonable jury to conclude that Defendants' conduct was so extreme and outrageous as to cause Plaintiff's injury.

### 2. Intrusion upon Seclusion

"Invasion of privacy" has been the basis of a cause of action in Maryland since it was recognized in *Carr v. Watkins*, 227 Md. 578, 177 A.2d 841, 845 (1962). In 1969, the Court of Appeals of Maryland recognized that "four courses of conduct may give rise to a cause of action" including intrusion upon seclusion. *Household Fin. Corp. v. Bridge*, 252 Md. 531, 250 A.2d 878, 883 (1969). The claim for intrusion upon seclusion has not been reviewed frequently by the Maryland appellate courts. In a recent case, the Court of Special Appeals of Maryland reversed a Circuit Court for Baltimore City decision granting summary judgment to the defendant newspaper, finding that there were genuine issues of material fact as to whether the newspaper intruded upon a former congressman's seclusion when reporters visited him in an assisted living facility and published comments he made in the paper. *Mitchell v. Baltimore Sun Co.*, 164 Md.App. 497, 883 A.2d 1008, 1023 (Md.Ct.Spec.App.2005), *cert. denied*, 390 Md. 501, 889 A.2d 418 (2006).

■ As to the intrusion upon seclusion claim in this case, Defendants argue that

"the evidence shows there was *no* intrusion into *anything*—not the funeral, not plaintiff's home, not his psyche." *(Pro se* Defs.' Mem. Supp. Post-trial Mots. 22 (emphasis in original).) They argue that Plaintiff "reached, even eagerly dug, into a public place and *chose* to read or hear the words." *(Id.* (emphasis in original).) A reasonable jury could find, however, that when Snyder turned on the television to see if there was footage of his son's funeral, he did not "choose" to see close-ups of the Defendants' signs and interviews with Phelps and Phelps–Roper, but rather their actions intruded upon his seclusion.

Defendants' argument also ignores the impact that "The Burden of Marine Lance Cpl. Matthew Snyder" had on Plaintiff. Defendants' utilization of the death of Matthew Snyder was not limited to his funeral. To publish comments on the Internet that a young man, whom Defendants had never met, was raised for the devil and taught to defy God can clearly be found to not only have inflicted emotional distress upon the father, Albert Snyder, but also to have invaded his privacy during a time of bereavement.[13] There was sufficient evidence in the trial record for a reasonable jury to conclude that Defendants' conduct unreasonably invaded Snyder's privacy and intruded upon his seclusion during a time of bereavement.

### 3. Civil Conspiracy

■ With respect to the civil conspiracy claim, Defendants did not dispute that there was an agreement to commit the acts at issue in this case. The jury was instructed that under Maryland law Plaintiff had to show that there was an agreement by at least two persons to accomplish

---

**13.** The evidence in the case clearly indicated that Albert Snyder did not seek to review the Defendants' pronouncements on the church website, www.godhatesfags.com. Snyder learned of this publication when noticing a reference to his son after running a search on Google.

an unlawful act, and that the act resulted in damages to Plaintiff. The jury was specifically instructed that it could not find Defendants liable for civil conspiracy unless it found them liable for either intentional infliction of emotional distress or invasion of privacy by intrusion upon seclusion. The jury, having returned a verdict against Defendants on both causes of action, clearly had sufficient evidence to return a verdict against Defendants on the claim of civil conspiracy. Specifically, there was evidence of the agreement to carry signs at the funeral containing certain messages the jury found to be directed at the Snyder family. In addition, there was evidence of Defendants' agreement to publish "The Burden of Marine Lance Cpl. Matthew Snyder" on the website of the Westboro Baptist Church.[14]

Accordingly, because Plaintiff presented sufficient evidence for a reasonable jury to find in his favor on all three claims, Defendants' Motions for Judgment as a Matter of Law and Judgment Notwithstanding the Verdict are DENIED.

## II. Motion to Amend the Judgment & Motion for Reconsideration

Next, Defendants have moved for reconsideration of "all counts, issues and theories" as well as an amendment of the judgment, pursuant to Rule 59 of the Federal Rules of Civil Procedure. *(Pro se Defs.' Mem. Supp. Post-trial Mots. 1; Church Defs.' Mem. Supp. Post-trial Mots. 4.)* As noted above, " 'reconsideration of a judgment after its entry is an extraordinary remedy which should be used sparingly.' " *Pacific Ins. Co.*, 148 F.3d at 403 (citation omitted). The Fourth Circuit has identified three grounds for amending an earlier judgment: "(1) to accommodate an

intervening change in controlling law; (2) to account for new evidence not available at trial; or (3) to correct a clear error of law or prevent manifest injustice." *Id.* (citation omitted). Defendants have not presented any arguments with respect to new evidence or changes in the law. Instead, they argue that this Court made several clear errors of law and essentially allege manifest injustice.

Defendants first challenge this Court's ruling on the constitutionality of their actions, arguing that this Court should have held as a matter of law that they were entitled to First Amendment protection. As discussed *supra*, however, the First Amendment does not offer absolute protection. Whether Defendants' actions constituted intentional infliction of emotional distress and invasion of privacy by intrusion upon seclusion were submitted to the jury, which clearly decided that Defendants' conduct was so outrageous as to constitute the commission of both of these wrongful acts.

Defendants argue also that this Court erred in denying their request for individualized *voir dire* of each potential juror. Under Rule 47(a) of the Federal Rules of Civil Procedure,

[t]he court may permit the parties or their attorneys to examine prospective jurors or may itself do so. If the court examines the jurors, it must permit the parties or their attorneys to make any further inquiry it considers proper, or must itself as any of their additional questions it considers proper.

Fed.R.Civ.P. 47(a). Trial courts have broad discretion in the conduct of *voir dire*. *United States v. Bakker*, 925 F.2d 728, 733 (4th Cir.1991); *United States v.*

---

**14.** Although both Phelps and Phelps–Davis testified that they had not actually read "The Burden of Marine Lance Cpl. Matthew Snyder" before Phelps–Roper placed it on the church's website, they condone the practice in general as an appropriate expression of their religious faith.

*LaRouche,* 896 F.2d 815, 829 (4th Cir. 1990). "[T]he only issue is whether [the] *voir dire* was sufficient to empanel an impartial jury." *LaRouche,* 896 F.2d at 830.

▇ This Court took several measures to ensure that an unbiased jury would be empaneled. The parties requested, and this Court permitted, a jury questionnaire to be sent to all potential jurors, asking questions about their views on protesting, the military, the First Amendment of the United States Constitution, and other "screening" questions. As such questionnaires are rarely sent to potential jurors by this Court, this was an extraordinary precaution. These questionnaires were sent to several hundred individuals and the ultimate venire pool itself consisted of more than 100 people—more than triple the usual size of a venire pool in a civil case. The responses to the questionnaires were made available for all parties to review before trial. If the potential jurors' questionnaire responses indicated a bias towards or against one of the parties, they were stricken for cause by this Court during *voir dire.*

Every potential juror who indicated that he or she had some knowledge of the case was questioned individually at the bench, and many were stricken if they had already formed an opinion about the case. Where, as in this case, a trial has received pre-trial publicity, the Fourth Circuit has held that specific questioning regarding potential jurors' exposure to the publicity and what effect it had on their opinions was sufficient to remove any concerns about bias. *See Bakker,* 925 F.2d at 733. Thus, this Court's individualized questioning of the potential jurors about their knowledge of the case gave the parties ample opportunity to inquire about preconceived opinions. Furthermore, as most people in the venire pool were called to the bench at some point, the attorneys were able to question almost all of them individ-

ually. There was no error in the conduct of *voir dire* in this case.

Defendants Phelps–Roper and Phelps–Davis specifically allege manifest injustice. They argue that this Court was biased against them and created "an environment of such hostility" that a mistrial should have been ordered. *(Pro se* Defs.' Mem. Supp. Post-trial Mots. 20–21.) The Supreme Court has held that "the pejorative connotation of the terms 'bias' and 'prejudice' demands that they be applied only to judicial predispositions that go beyond what is normal and acceptable." *Liteky v. United States,* 510 U.S. 540, 552, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994). Thus, in *Liteky,* the Supreme Court held that a district court judge was not biased or prejudiced against the defendants during trial by asking questions of certain witnesses, admonishing defendants and counsel, adopting an "alleged 'anti-defendant tone,'" and cutting off testimony allegedly helpful to the defendants. *Id.* at 556, 114 S.Ct. 1147. The Supreme Court held that those actions by the trial judge "consist[ed] of judicial rulings, routine trial administration efforts, and ordinary admonishment (whether or not legally supportable) to counsel and to witnesses." *Id.* The Supreme Court further reasoned that the judge did not rely on knowledge acquired outside of the case proceedings or "display[ ] deep-seated and unequivocal antagonism that would render fair judgment impossible." *Id.*

In this case, as in *Liteky,* the *pro se* Defendants challenge certain comments made by this Court, specifically comments concerning their religion. First, no such comments were made in the presence of the jury. Second, none of the comments were grounded in any predisposed bias but rather reflected Defendants' own testimony concerning their religious beliefs and actions—information which came to light

during the trial. The *pro se* Defendants also contend that this Court cut short their arguments and interrupted them on occasion. However, the *Liteky* Court made clear that this conduct is not grounded in bias or prejudice but rather falls into the category of "routine trial administration efforts." *Id.* The trial in this case was scheduled to take approximately eight to ten trial days and all parties were required to keep a rigorous pace to ensure the trial would end on time. This Court never asked any questions of any of the witnesses in this case. Accordingly, under the standards set forth by the Supreme Court concerning judicial bias, this Court finds that the motion for mistrial was appropriately denied, as no bias or prejudice towards the Defendants was evident.

Accordingly, Defendants' Motions to Amend the Judgment and for Reconsideration are DENIED.

## III. Motion for New Trial and/or *Remittitur*

### A. New Trial

■ Defendants also move for a new trial pursuant to Rule 59(a). A new trial should only be granted "if 1) the verdict is against the clear weight of the evidence, 2) is based on evidence which is false, or 3) will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 650 (4th Cir.2002) (citations omitted). As to the second basis for a new trial, there is no contention that the verdict was based on false evidence. Thus, only the first and third bases will be addressed.

As discussed *supra*, there was sufficient evidence for a reasonable jury to return a verdict on Plaintiff's claims for intrusion upon seclusion, intentional infliction of emotional distress, and civil conspiracy. In considering the motions for a new trial,

however, this Court may additionally consider the weight of the evidence and the credibility of the witnesses. *See Conner v. Schrader–Bridgeport Int'l, Inc.*, 227 F.3d 179, 200 (4th Cir.2000) (citation omitted). The events leading up to the March 10, 2006 funeral of Lance Cpl. Snyder are undisputed. The parties presented different evidence concerning the exact distance the protestors stood from St. John's Catholic Church and whether Plaintiff could see their signs from the funeral procession's route. However, Snyder testified that even though he saw the tops of the signs during the funeral procession, he did not see the signs' content until a news program later that day. It was undisputed at trial that he saw the content of "The Burden of Marine Lance Cpl. Matthew Snyder" online.

As to the third reason for granting a new trial, Defendants first argue that "under Maryland law, reference to religion to inflame the passions of the jury is improper and prejudicial, and should result in mistrial and/or a new trial." *(Pro se* Defs.' Mem. Supp. Post-trial Mots. 6; Church Defs.' Mem. Supp. Post-trial Mots. 7.) Defendants cite *Tierco Maryland, Inc. v. Williams*, 381 Md. 378, 849 A.2d 504, 523 (2004), in which the Court of Appeals of Maryland held that "where the purpose of the reference to race, nationality, or religion is to inflame the passions of the jury, the reference is improper and prejudicial." In this case, however, Defendants themselves brought their religious beliefs into question by introducing evidence and arguments that their protest and the "epic" posted on the church's website were religious activities. Neither Plaintiff's counsel nor this Court "mock[ed] and attack[ed] . . . defendants' religious beliefs and practices" as Defendants contend. *(See pro se* Defs.' Mem. Supp. Post-trial Mots. 7.) If the trial "shifted to what Defendants believe" it was because Defendants have consistently argued that the content of their

signs and the website publication constituted a religious message. *(See* Church Defs.' Mem. Supp. Post-trial Mots. 8.)

## B. *Remittitur*

### 1. Compensatory Damages

Defendants argue that the compensatory damages awarded by the jury are excessive and require that this Court grant a new trial. Because Defendants variously cite to both federal and state law, this Court must first determine the appropriate standard under which to review Defendants' arguments.

In *Johnson v. Parrish,* 827 F.2d 988 (4th Cir.1987), the Fourth Circuit held that "the decision to set aside an excessive verdict and grant a new trial pursuant to Rule 59 is purely a matter of federal law." *Id.* at 991. The Supreme Court thereafter decided *Gasperini v. Center for Humanities, Inc.,* 518 U.S. 415, 116 S.Ct. 2211, 135 L.Ed.2d 659 (1996), in which it held that the doctrine of *Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), "precludes a recovery in federal court significantly larger than the recovery that would have been tolerated in state court." *Gasperini,* 518 U.S. at 430, 116 S.Ct. 2211. Therefore, a federal district court sitting in diversity must apply substantive state law standards when it considers a Rule 59(a) motion for a new trial based upon the alleged excessiveness of a jury's compensatory damage award. *Gasperini,* 518 U.S. at 430–31, 439, 116 S.Ct. 2211. Therefore, *Gasperini* requires that this Court apply Maryland substantive law in determining whether to reduce the amount of damages, notwithstanding the fact that the procedural elements of Rule 59(a) still apply.

Accordingly, this Court must first address the Maryland statutory cap on noneconomic damages. *See Gasperini,* 518 U.S. at 428, 116 S.Ct. 2211 ("We start from a point the parties do not debate. [Appellant] acknowledges that a statutory cap on damages would supply substantive law for *Erie* purposes."). Second, this Court must apply the Maryland standard to review the excessiveness of the compensatory damage award—to wit: whether the verdict is grossly excessive, shocks the conscience of the court, is inordinate, or is simply excessive.[15] *Owens–Corning v. Walatka,* 125 Md.App. 313, 725 A.2d 579, 590–91 (Md.Ct. Spec.App.1999).

### a. Statutory Cap on Noneconomic Damages

Defendants' first argument in support of reducing the $2.9 million compensatory award is that it exceeds Maryland's statutory cap on noneconomic damages. In Maryland, a $500,000 cap applies to noneconomic damages for personal injuries arising after October 1, 1994. Md.Code Ann., Cts. & Jud. Proc. § 11–108(b)(2)(ii) (LexisNexis 2006) ("[I]n any action for damages for personal injury or wrongful death in which the cause of action arises on or after October 1, 1994, an award for noneconomic damages may not exceed $ 500,000."). The cap increases by $15,000 each October beginning in 1995. *Id.* § 11–108(b)(2)(ii). In this case, the cause of action accrued at the earliest on March 10, 2006, the date on which Lance Cpl. Snyder was laid to rest at St. John's Catholic Church in Westminster, Maryland. When Plaintiff's cause of action accrued, eleven years had passed since the $15,000 incremental increase took effect. Therefore,

---

**15.** The Maryland standard differs from the federal standard, which is whether the award is "against the clear weight of the evidence, or based upon evidence which is false, or will result in a miscarriage of justice." *Cline v.* *Wal–Mart Stores, Inc.,* 144 F.3d 294, 305 (4th Cir.1998) (quoting *Atlas Food Sys. & Servs., Inc. v. Crane Nat'l Vendors, Inc.,* 99 F.3d 587, 594 (4th Cir.1996)).

the statutory cap for present purposes is $665,000.

■ The parties do not dispute that compensatory damages were awarded for purely noneconomic injury. The Maryland statutory cap, however, simply does not apply in this case. In *Cole v. Sullivan*, 110 Md.App. 79, 676 A.2d 85 (Md.Ct. Spec.App.1996), the Court of Special Appeals clearly held that the statutory cap found in section 11–108 does not apply to intentional torts. The court explained as follows:

> There are a plethora of cases in this and in other jurisdictions dealing with clauses in insurance policies excluding intentional misconduct. While we do not believe this exclusion of intentional misconduct from insurance coverage alone to be dispositive, the conspicuous absence of any discussion in § 11–108's legislative history of its application to intentional injuries convinces us that § 11–108 does not apply to intentional torts, whether or not personal bodily injuries are involved.

*Id.* at 92. The underlying causes of action in this case—intentional infliction of emotional distress and intrusion upon seclusion—are both intentional torts. The jury's compensatory award was therefore based solely on Defendants' intentional conduct, thereby placing it beyond the ambit of the statutory cap. Despite the unambiguous holding of Cole, Defendants make two additional arguments with respect to the statutory cap.

*First, Defendants argue that because the Court of Appeals has never directly addressed* the applicability of the statutory cap to intentional torts, this Court should certify the question for resolution by that court. See Md.Code Ann., Cts. & Jud.

Proc. § 12–603 (LexisNexis 2006) ("The Court of Appeals of this State may answer a question of law certified to it by a court of the United States or by an appellate court of another state or of a tribe, if the answer may be determinative of an issue in pending litigation in the certifying court and there is no controlling appellate decision, constitutional provision, or statute of this State."). *Cole* is a "controlling appellate decision" under section 12–603, and, therefore, this Court finds no basis to certify the question to the Court of Appeals.

Second, Defendants contend that *Cole* was incorrectly decided. In diversity, this Court must apply the law of the state's highest court. In the absence of a controlling decision from the highest state court, this Court should follow the decisions of the intermediate appellate court unless it is " 'convinced by other persuasive data that the highest court of the state would decide otherwise.' " *Comm. v. Estate of Bosch*, 387 U.S. 456, 465, 87 S.Ct. 1776, 18 L.Ed.2d 886 (1967) (quoting *West v. Am. Tel. & Tel. Co.*, 311 U.S. 223, 237, 61 S.Ct. 179, 85 L.Ed. 139 (1940)). The absence of a decision by the Court of Appeals that is directly on point does not equate to uncertainty in Maryland law. The Court of Appeals exercises discretionary jurisdiction by granting writs of *certiorari*, and the court's silence on a particular issue, such as the applicability of the statutory cap to intentional torts, indicates approval of the line of cases addressing it in the lower state courts, including the Court of Special Appeals. More importantly, *Cole* has not received a single negative citing reference in the decade since it was decided.[16] In sum, the Maryland statutory cap on noneconomic damages does not apply to intentional acts such as intentional inflic-

---

**16.** The only appellate case in Maryland that cites to *Cole v. Sullivan* on this issue is *Anchor Packing Co. v. Grimshaw*, 115 Md.App. 134, 692 A.2d 5, 15 (Md.Ct.Spec.App.1997), in which the Court of Special Appeals reiterated that "in *Cole v. Sullivan*, ... we held that ... § 11–108 does not apply to awards stemming from the commission of intentional torts."

tion of emotional distress and invasion of privacy by intrusion upon seclusion.

### b. Factual Basis for Compensatory Award

■ Aside from their argument with respect to the statutory cap, Defendants argue that the evidence does not warrant a compensatory award of $2.9 million. Under Maryland law, a compensatory damage award should be reduced if "the verdict is 'grossly excessive,' or 'shocks the conscience of the court,' or is 'inordinate' or 'outrageously excessive,' or even simply 'excessive.'" *Banegura v. Taylor*, 312 Md. 609, 541 A.2d 969, 976 (1988) (citing *Dagnello v. Long Island Railroad Co.*, 289 F.2d 797, 802 (2d Cir.1961); *Conklin v. Schillinger*, 255 Md. 50, 257 A.2d 187, 197 (1969)). The Court of Appeals has stated that "all of these formulae mean substantially the same thing, . . . that the damages are 'such as all mankind must be ready to exclaim against, at first blush. . . .'" *Conklin*, 257 A.2d at 197 (internal citations omitted).

In reviewing the excessiveness of a compensatory damages award, Maryland trial courts are afforded broad discretion to determine whether the jury's award should be reduced. *See Banegura*, 541 A.2d at 976 ("We know of no case where this Court has ever disturbed the exercise of the lower court's discretion in denying a motion for new trial because of the inadequacy or excessiveness of damages." (quoting *Kirkpatrick v. Zimmerman*, 257 Md. 215, 262 A.2d 531, 532 (1970))). In turn, the trial court is expected to afford great deference to the decision of the jury and to reduce

the compensatory damage award only rarely.[17] Indeed, the trial court "should extend the fullest consideration possible to the amount returned by the jury before it concludes that it shocks his conscience, is grossly excessive, or is excessive." *Conklin*, 257 A.2d at 197 (internal quotations omitted). In *Buck v. Cam's Broadloom Rugs*, 328 Md. 51, 612 A.2d 1294 (1992), the Court of Appeals explained as follows:

[A] jury's verdict should not be casually overturned. In our system of justice, the jury is sacrosanct and its importance is unquestioned. The members of a jury see and hear the witnesses as they testify. They watch them as they sweat, stutter, or swagger under the pressure of cross-examination. This enables the jury to develop a feel for the case and its personal dynamics which cannot be conveyed by the cold printed page of a record reproduced for appellate review.

*Id.* at 1298–99 (*quoting Boscia v. Massaro*, 365 Pa.Super. 271, 529 A.2d 504, 508 (Pa. 1987)).

■ Maryland courts have considered the corresponding awards given in comparable cases as a factor in determining whether a particular award is excessive. The parties in this case have not provided, nor has this Court been able to locate, another case with facts sufficiently similar to justify a direct comparison. This is of little consequence, however, because "while comparison to other similar cases is helpful, a review of the specific evidence presented to the jury, rather than a mathematical analysis, more appropriately enables [a court] to determine whether the award was shocking."[18] *Owens Corning*

---

17. Although, as noted above, this Court applies state substantive law in determining the excessiveness of a compensatory damage award, it is instructive that the Fourth Circuit has explained that "[c]ourts defer to a jury's award of damages for intangible harms, such as emotional distress, 'because the harm is

subjective and evaluating it depends considerably on the demeanor of the witnesses.'" *Fox v. Gen. Motors Corp.*, 247 F.3d 169, 180 (4th Cir.2001) (internal citations omitted).

18. Although the Fourth Circuit has directed district courts to apply a series of factors in

v. *Bauman*, 125 Md.App. 454, 726 A.2d 745, 779–80 (Md.Ct.Spec.App.1999). This Court finds that the jury's compensatory award does not "shock the conscience" based on the evidence presented in this case. Plaintiff clearly demonstrated emotional injury which he will continue to suffer.

By finding in favor of Plaintiff and awarding him $2.9 million in compensatory damages, the jury based its finding on several expert witnesses. Plaintiff's treating physician, Dr. Scott Russell Mann, testified that Plaintiff had difficulty sleeping because "he keeps thinking about how the protestors ruined his son's funeral." (Trial Tr. 104, Oct 23, 2007.) He also testified that Plaintiff had trouble concentrating, lacked energy, and demonstrated other signs of depression due to the "emotional turmoil resulting from the protestors." *(Id.* at 105–06.) Dr. Mann testified that his "assessment was that his depression was not adequately controlled with [the] ongoing stressors related to the death of his son and to subsequent actions by [Defendants]," *(id.* at 122) and that his "medical opinion is that [Plaintiff] has not done well with his grieving process because of [Defendants]." *(Id.* at 124–25.) Dr. Mann concluded as follows:

> I am of the opinion that [the Plaintiff] had an exacerbation of his depression because of [the Defendants'] actions and [the Plaintiff's] inability to go through the normal grieving process. [The Plaintiff] was in a very sensitive state at the time of his son's death. Normally a funeral helps get some closure and the support of the community and friends at that time helps with that closure and the interruption of that with negative feelings and negative emotions being

brought up really just stops that healing process and because of that, [the Plaintiff's] had a lot of difficulty with his depression. . . .

*(Id.* 130.)

Dr. Mann recommended that Plaintiff seek treatment by Dr. Jeffrey Willard, a psychologist. Dr. Willard testified at trial that "[m]y opinion is that the demonstration and the things that [Plaintiff] talked about [seeing] in the website *[i.e.* "The Burden of Marine Lance Cpl. Matthew Snyder"] have made the depression worse and lengthened it." *(Id.* at 158–59.) Dr. Willard's testimony corroborated Plaintiff's testimony with respect to his reaction to the publication on the website. Additionally, Chaplain Major Terry Callis testified that the Plaintiff's trauma, although typical in the context of a military funeral, was exacerbated by "the [D]efendants being . . . in the proximity of the funeral itself and then the later news broadcasts [and] Mr. Snyder seeing the events on television and reading them in the paper. The events that seem to overshadow the honor and dignity that should have been prescribed to the funeral service of his son." (Trial Tr. 507, Oct 25, 2007.)

The jury also undoubtedly relied on the testimony of the Plaintiff, Albert Snyder. During his emotional testimony at trial, Plaintiff recounted fond memories of his son, Matthew Snyder, and the traumatic news of his passing. He described the severity of his emotional injury, stating that he is often tearful and angry, and that he becomes so sick to his stomach that he actually physically vomits. (Trial Tr. 226, 244, Oct 24, 2007.) He testified that Defendants placed a "bug" in his head, *(id.* at 226), such that he is unable to separate

---

determining whether a compensatory award for emotional injury is excessive, *see Knussman v. Maryland,* 272 F.3d 625, 640 (4th Cir.2001) (citing *Price v. City of Charlotte,* 93 F.3d 1241, 1254 (4th Cir.1996)), Maryland has not adopted a comparable factor-based test.

thoughts of his son from the Defendant's actions: "there are nights that I just, you know, I try to think of my son at times and every time I think of my son or pass his picture hanging on the wall or see the medals hanging on the wall that he received from the [M]arine [C]orps, I see those signs." *(Id.* at 234.) He testified also that "I want so badly to remember all the good stuff and so far, I remember the good stuff, but it always turns into the bad." *(Id.* at 253.)

Plaintiff also testified as to the permanency of the emotional injury. He testified that "I think about the sign [*i.e.* Thank God for dead soldiers] every day of my life.... I see that sign when I lay in bed at nights. I have one chance to bury my son and they took the dignity away from it. I cannot re-bury my son. And for the rest of my life, I will remember what they did to me and it has tarnished the memory of my son's last hour on earth." *(Id.* at 228.) He stated also that "somebody could have stabbed me in the arm or in the back and the wound would have healed. But I don't think this will heal." *(Id.* at 259.)

Throughout trial, Plaintiff demonstrated significant emotion, appearing visibly shaken and distressed, and was often reduced to tears. On occasion during the trial, Plaintiff requested and was granted leave from the courtroom to compose himself. The jury witnessed firsthand Plaintiff's anguish and the unresolved grief he harbors because of the failure to conduct a normal burial.

This Court is obviously cognizant of the large sum awarded in this case. Nonetheless, it is not the province of this Court in a post-trial motion challenging a damage award to simply insert its own judgment for that of the jury. Instead, this Court is tasked with giving the "fullest consideration" to the judgment of the jury. *Conklin*, 257 A.2d at 197. It is with this princi-

ple in mind that this Court concludes that a compensatory award of $2.9 million does not shock the conscience.

## 2. Punitive Damages

Having found that the jury's award for $2.9 million in compensatory damages does not shock the conscience and must be upheld, this Court must determine whether the jury's punitive award should be reduced. The jury awarded a total of $8 million in punitive damages: $500,000 against each Defendant on the intentional infliction of emotional distress claim and $1.5 million against each Defendant on the intrusion upon seclusion claim.

 Defendants initially argue that "actual malice" is insufficiently defined under Maryland case law and that, even if it were sufficiently defined, this Court's jury instructions did not adequately define the term. Their arguments are without merit. Maryland case law adequately defines actual malice as a "sense of evil or wrongful motive, intent to injure, ill will, or fraud." *Tierco Md., Inc. v. Williams,* 381 Md. 378, 849 A.2d 504, 526 n. 29 (2004) (quoting *Bowden v. Caldor,* 350 Md. 4, 710 A.2d 267, 276 (1998)); *see also Montgomery Ward v. Wilson,* 339 Md. 701, 664 A.2d 916, 930 n. 5 (1995) (defining actual malice as "conduct characterized by evil or wrongful motive, intent to injure, knowing and deliberate wrongdoing, ill will or fraud"). This Court, in conformity with Maryland law, instructed the jury that "[a]n act is done maliciously if it is done with a sense of hate, ill-will, spite, or a desire to inflict unnecessary injury," and therefore there is no basis to set aside the punitive damages award based on inadequate jury instructions.

Next, Defendants argue that the punitive damage award is excessive and violates the Due Process Clause of the Fifth Amendment pursuant to the principles set

forth by the Supreme Court in *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996), and *Philip Morris USA v. Williams*, —— U.S. ——, 127 S.Ct. 1057, 166 L.Ed.2d 940 (2007). Alternatively, the Defendants argue that the punitive damages award is unsupported by the record.

### a. Constitutional Limits on Punitive Damages

In *Gore*, the Supreme Court set forth three guideposts to review a punitive award for excessiveness: "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." [19] *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 418, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003) (discussing the *Gore* factors).

As to the first guidepost, the Supreme Court has stated that "the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." *Gore*, 517 U.S. at 575, 116 S.Ct. 1589. Determining the degree of reprehensibility, however, requires weighing a non-exhaustive list, including whether: "the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the

result of intentional malice, trickery, or deceit, or mere accident." *Campbell*, 538 U.S. at 419, 123 S.Ct. 1513 (citing *Gore*, 517 U.S. at 576–77, 116 S.Ct. 1589). "The existence of any one of these factors weighing in favor of a plaintiff may not be sufficient to sustain a punitive damages award; and the absence of all of them renders any award suspect." *Campbell*, 538 U.S. at 419, 123 S.Ct. 1513.

Defendants have a constitutional right to express their religious beliefs and to demonstrate on public streets. Defendants' conduct in this case, however, went beyond the bounds of civil discourse, to the point that their conduct was reprehensible. The jury in this case had more than a sufficient basis to find that displaying signs such as "Thank God for dead soldiers," "You are going to hell," and "God hates you," at a young Marine's funeral was reprehensible. The jury also had more than a sufficient basis to find that the online publication of "The Burden of Marine Lance Cpl. Matthew Snyder," which declared, *inter alia*, that he had been "raised for the devil," was reprehensible. In short, utilizing Matthew Snyder's death as a vehicle for hateful expression was sufficient to support a punitive damages award.

While Defendants' conduct was reprehensible and justified an award of punitive damages, this Court must address the amount of that punitive damage award. Some of the factors cut in favor of a large punitive award. For example, the Supreme Court noted that large punitive awards may be warranted where the plaintiff was "financially vulnerable." *Gore*, 517 U.S. at 576, 116 S.Ct. 1589. In *Gore*, the

---

**19.** In their post-trial submissions, Defendants rely principally on *Bowden v. Caldor, Inc.*, 350 Md. 4, 710 A.2d 267 (1998), in which the Court of Appeals of Maryland adopted the constitutional safeguards set forth in *Gore* as part of Maryland common law. *See Bowden*, 710 A.2d at 278 ("[T]he legal principles ...

applicable to judicial review of punitive damages awards for excessiveness ... are set forth as principles of Maryland common law."). This Court will treat the guideposts delineated in *Gore* as constitutional restraints, not as aspects of Maryland common law.

plaintiff's injuries were economic in nature, namely, the reduction in value of the plaintiff's automobile. *Id.* at 563–64, 116 S.Ct. 1589. In this case, however, the Plaintiff's injury was noneconomic, and, therefore, his financial vulnerability is irrelevant. Nonetheless, the emotional vulnerability of a particular plaintiff is likewise a vital consideration, especially in this case, where Plaintiff was in a state of bereavement, having just buried a son killed in military service. As this case ably demonstrates, reprehensible conduct may manifest itself in noneconomic injury. Defendants' conduct was also plainly intentional and demonstrated an indifference to Plaintiff's health.

■ Yet other factors do not necessarily weigh in favor of sustaining the entire award. Defendants' conduct at the funeral was not repetitive. Although the "epic" of Matthew Snyder remained on the church website for a considerable period of time, there was no evidence at trial of any additional publications directed at the Snyder family. There was no evidence at trial of any additional publications. Furthermore, although Plaintiff suffered significant emotional injury, the physical injury—exacerbation of a preexisting diabetic condition—was comparably minimal.

As to the second guidepost, the disparity between the actual and potential harm, the Supreme Court has refused to draw a "mathematical bright line between the constitutionally acceptable and the constitutionally unacceptable" punitive awards. *Id.* at 582–83, 116 S.Ct. 1589 (quoting *Pac. Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 18, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991)). Indeed, the Supreme Court explained that "low awards of compensatory damages may properly support a higher ratio than high compensatory awards, if, for example, . . . the injury is hard to detect or the monetary value of noneconomic harm might have been difficult to determine."

*Id.* at 582, 116 S.Ct. 1589. This case, however, did not result in low compensatory damages. Moreover, an $8 million punitive award, in relation to the $2.9 million compensatory award, is plainly within the permissible constitutional ratio. A ratio of four to one has been cited by the Supreme Court as being "close" to constitutionally excessive, *Haslip*, 499 U.S. at 23–24, 111 S.Ct. 1032, and the same ratio was again cited in *Gore*, 517 U.S. at 581, 116 S.Ct. 1589. *See also Campbell*, 538 U.S. at 425, 123 S.Ct. 1513 (finding that "[s]ingle-digit multipliers are more likely to comport with due process").

The third guidepost involves "[c]omparing the punitive damages award and the civil or criminal penalties that could be imposed for comparable misconduct." *Gore*, 517 U.S. at 583, 116 S.Ct. 1589. In 2006, the Maryland General Assembly passed legislation providing that "[a] person may not engage in picketing activity within 100 feet of a funeral, burial, memorial service, or funeral procession that is targeted at one or more persons attending the funeral, burial, memorial service, or funeral procession." Md.Code Ann., Crim. Law § 10–205(c) (LexisNexis 2006). A violation of this provision constitutes a misdemeanor and subjects the individual to "imprisonment not exceeding 90 days or a fine not exceeding $1,000 or both." *Id.* § 10–205(d).

Defendants argue that this provision clearly mandates a reduction in the punitive award. This guidepost, although clearly relevant, provides less guidance than Defendants claim. First, the statute, which took effect on October 1, 2006, could not have provided Defendants with any fair notice of appropriate civil punishment because they protested Matthew Snyder's funeral on March 10, 2006. A reduction of the punitive award based solely on the retroactive application of a comparable

criminal penalty is unwarranted, especially under the guise of fair notice. Second, Defendants have made their intention to continue to protest funerals well known, and the maximum statutory punishment—imprisonment for ninety days and a $1,000 fine—is unlikely to deter any of the Defendants from similar conduct in the future.[20]

Defendants also contend that the Supreme Court's most recent decision on punitive damages, *Philip Morris USA v. Williams*, —— U.S. ——, 127 S.Ct. 1057, 166 L.Ed.2d 940 (2007), requires a reduction. In *Philip Morris USA*, the Supreme Court held that "the Constitution's Due Process Clause forbids a State to use a punitive damages award to punish a defendant for injury that it inflicts upon nonparties or those whom they directly represent, *i.e.*, injury that it inflicts upon those who are, essentially, strangers to the litigation." *Id.* at 1063. The Supreme Court, however, reaffirmed that plaintiffs may show harm to nonparties to demonstrate "a different part of the punitive damages constitutional equation, namely, reprehensibility." *Id.* at 1063–64. Therefore, while a jury may consider harm to others as evidence of reprehensibility, it may not punish a defendant for the harm actually done to those nonparties.

The *Philip Morris USA* decision is inapplicable. In that case, plaintiff's counsel argued to the jury in the punitive damages portion of the underlying trial to "think about how many other [cigarette smokers] in the last 40 years in the State of Oregon there have been. . . . In Oregon, how many people do we see outside, driving home . . . smoking cigarettes? . . . [C]igarettes . . .

are going to kill ten [of every hundred]. [And] the market share of Marlboros [i.e., Philip Morris] is one-third [i.e., one of every three killed]." *Id.* at 1061. In light of this argument, the Supreme Court was concerned about the reference to past harm to third parties. In this case, Plaintiff's counsel did not refer to any other prior injuries inflicted by Defendants. Instead, Plaintiff's counsel argued for a punitive award that is

> proportionate [to the harm] and appropriate that says don't do this in Maryland again. Do not bring your circus of hate to Maryland again. That no son or daughter of Maryland shall have [his or her] funeral defiled by the malicious tactics of the [D]efendants again and that no future father or mother suffers this.

(Tr. of Punitive Arg. 9.) Plaintiff's counsel did not mention *past* harm to third parties, only *future* harm to third parties. The reference to future harm is necessary in addressing the deterrent value of the punitive award, especially where, as here, the reference is only to future conduct within the state. *See Philip Morris USA,* 127 S.Ct. at 1059 (reaffirming that "[t]his Court has long made clear that '[p]unitive damages may properly be imposed to further a State's legitimate interests in punishing unlawful conduct and deterring its repetition'" (citing *Gore,* 517 U.S. at 568, 116 S.Ct. 1589)).

Under the constitutional guideposts as set forth by the Supreme Court in *Gore,* this Court finds that a reduction in the total punitive damages award is necessary. Because this reduction, set forth below, is

**20.** Indeed, representatives of the Westboro Baptist Church have returned to Maryland in the aftermath of the verdict in this case. In December 2007, five members of a Maryland family were killed on an Ohio highway after a truck traveling in the wrong direction struck their vehicle. Three members of the Westboro Baptist Church demonstrated at their funeral, which was held in Maryland, contending that the deaths of these five Marylanders were God's punishment against the Maryland community for the jury verdict in this case. *Westboro Links Family's Deaths to $11M Verdict,* Assoc. Press, The Daily Record, Jan. 8, 2008, at 8A.

based on constitutional principles, this Court will not offer the Plaintiff the option of a new trial. *See Johansen v. Combustion Eng'g., Inc.,* 170 F.3d 1320, 1331 (11th Cir.1999).

### b. Application of *Bowden v. Caldor, Inc.*

In addition to the constitutional principles that this Court has already discussed, the Court of Appeals has added several other factors that are relevant only under state law. In *Bowden v. Caldor, Inc.,* 350 Md. 4, 710 A.2d 267 (1998), the Court of Appeals identified nine "legal principles or considerations which should guide a trial court in determining if a punitive damages award is excessive." *Id.* at 277. Three of the nine considerations are substantially the same as the *Gore* guideposts already discussed, and therefore need not be addressed again under state law. The remaining six factors are as follows: 1) the defendant's ability to pay; 2) the deterrent value of the punitive damages award; 3) punitive damages awarded in comparable cases; 4) other punitive damages awarded against the same defendant; 5) whether the punitive damages were for separate torts arising out of the same incident; and 6) the plaintiff's costs and expenses. *Id.* at 278–83.

Initially, two of these additional six factors are not applicable in this case. This Court has not been made aware of other punitive awards against these Defendants. Furthermore, evidence at trial indicated that Plaintiff did not personally bear all of the financial costs of the lawsuit. *See* http://www.matthewsnyder.org/help.html (last visited Feb. 1, 2008) (collecting donations from the public and stating that "[n]o money is being paid to the attorneys for the family, who have agreed to undertake this case on a *pro bono* ... basis").

The jury awarded punitive damages based on two separate torts—intentional infliction of emotional distress and intrusion upon seclusion—based on the same incidents, *i.e.,* the funeral protest and the subsequent publication of "The Burden of Marine Lance Cpl. Matthew Snyder." Therefore, the punitive award was clearly for separate torts arising out of the same incident. This Court takes that factor into account in addressing a reduction of the punitive damages award.

With respect to the third factor listed in the *Bowden* case, there are simply no punitive awards in comparable cases. The parties have not submitted to this Court any case with which to compare the punitive award, and this Court has been unable to find a Maryland case with any close factual similarity. Acknowledging that there is not a comparable case, Defendants have instead pointed more generally to a passage in *Bowden* in which the Court of Appeals determined that the largest award of punitive damages upheld by that court was $700,000. *Bowden,* 710 A.2d at 281. The Court of Special Appeals, however, had upheld much larger awards prior to *Bowden. See Potomac Elec. Power Co. v. Smith,* 79 Md.App. 591, 558 A.2d 768 (Md. Ct.Spec.App.1989) ($7.5 million); *Exxon Corp. v. Yarema,* 69 Md.App. 124, 516 A.2d 990 (Md.Ct.Spec.App.1986) ($910,000). The purpose of looking to comparable case law, however, is not to put a strict, judicially-created cap on the size of a punitive award.

The first and second principles set forth in the *Bowden* case—Defendants' ability to pay and the deterrent effect of the award—require discussion. It is quite clear that the punitive damages award in this case has had no deterrent effect on Defendants. In addition to three members of the Westboro Baptist Church arriving in Maryland to celebrate the death of innocent Maryland car accident victims, *see supra* note 20, Defendants have continued

to express their intent to appear and make their presence felt at the funerals of service men and women killed in the line of duty.

The key factor to be addressed by this Court is Defendants' ability to pay the punitive damages award. This factor is set forth by the Court of Appeals in *Bowden,* and it is also reflected in the constitutional standards noted above. In applying either a constitutional or state common law standard, it is clear to this Court that if a punitive damage award is excessive, it is this Court's obligation to order a reduction of that award.

During pre-trial discovery, Plaintiff sought Defendants' financial records in order to explore a claim for punitive damages. This Court granted Defendants' motion in opposition to the pre-trial disclosure of such information, but required that those records be submitted to this Court *in camera* to be held under seal pending the verdict of the jury. On the verdict form in which the jury awarded $2.9 million in compensatory damages, the jury also answered affirmatively to every question with respect to whether punitive damages should be awarded. Accordingly, as discussed with counsel prior to the commencement of trial, this Court then released Defendants' financial statements for review by Plaintiff.[21] *(See* Court's Ex. 1 (Paper No. 197).) This Court then allowed a period of time for the parties to prepare additional arguments to the jury, which were then presented on the issue of punitive damages. After a second round of deliberations, the jury awarded total punitive damages of $8 million against Defendants. This punitive damages award was apportioned by the jury on a separate verdict sheet as follows:

*Invasion of Privacy by Intrusion upon Seclusion:*

Subtotal: $6 million

Apportioned among the following Defendants:

| | |
|---|---|
| Fred W. Phelps, Sr.: | $1.5 million |
| Westboro Baptist Church: | $1.5 million |
| Shirley L. Phelps–Roper: | $1.5 million |
| Rebekah A. Phelps–Davis: | $1.5 million |

*Intentional Infliction of Emotional Distress:*

Subtotal: $2 million

Apportioned among the following Defendants:

| | |
|---|---|
| Fred W. Phelps, Sr.: | $500,000 |
| Westboro Baptist Church: | $500,000 |
| Shirley L. Phelps–Roper: | $500,000 |
| Rebekah A. Phelps–Davis: | $500,000 |

Defendant Westboro Baptist Church, Inc. submitted a financial statement indicating a net worth of $386,952. The evidence at trial indicated that fifty of the roughly sixty or seventy members of the church are related to Defendant Phelps by blood or marriage. The church is routinely financed by its members in support of various activities, including maintaining a website, producing videos at an onsite production facility, manufacturing signs at an onsite sign shop, and traveling around the country to broadcast the church's message. In short, the Westboro Baptist Church, Inc. is a well-financed corporation with a continuing source of funds to support its activities. The award of $500,000 in punitive damages as to the claim for intentional infliction of emotional distress was not excessive. The website of the church broadcast "The Burden of Marine Lance Cpl. Matthew Snyder" and the sign shop of the church produced signs which were personally directed at the Snyder family. While this Court does not find that $500,000 award of punitive damages to be excessive, the second award of $1.5 million on the invasion of privacy claim is excessive. In light of somewhat duplicative nature of the two claims as to damages, this Court finds

---

21. The financial statements were submitted under oath by Defendants Shirley L. Phelps–Roper, Rebekah A. Phelps–Davis, and Fred W. Phelps, Sr. Timothy B. Phelps, clerk of Defendant Westboro Baptist Church, Inc., submitted the financial statement of the church under oath as its corporate representative.

that a second award of $500,000 in punitive damages would be within the bounds of the standards set forth by the Supreme Court and reiterated by the Court of Appeals of Maryland. *See BMW of North Am., Inc. v. Gore,* 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996); *Bowden v. Caldor, Inc.,* 350 Md. 4, 710 A.2d 267 (1998). Accordingly, the total award of punitive damages as to Defendant Westboro Baptist Church, Inc. is reduced from $2 million to $1 million.

Defendant Fred W. Phelps, Sr., submitted a financial statement indicating a net worth of $231,129. That net worth is represented totally by equity in property that he has indicated is owned jointly with his spouse. While the evidence indicates that Phelps is the Pastor of the Westboro Baptist Church and is involved in all of the church's activities as the titular head of the family, there was no evidence that he was actively involved in the publication of "The Burden of Marine Lance Cpl. Matthew Snyder" on the church's website. This Court finds that a total award of $300,000 in punitive damages is appropriate as to Phelps. This award will apportioned in the amounts of $150,000 on the intentional infliction of emotional distress claim and $150,000 on the invasion of privacy claim. This Defendant's actions were not as egregious as those of his daughter, Shirley L. Phelps–Roper, and a total award of $300,000 is more appropriate in light of his stated net worth. Therefore, the total punitive damages award of $2 million against Defendant Fred W. Phelps, Sr. shall be reduced to $300,000.

Defendant Rebekah A. Phelps–Davis stands in a similar position to her father. There was no evidence that she actively participated in the publication of "The Burden of Marine Lance Cpl. Matthew Snyder." Like her father, though, she certainly entered into the agreement to engage in the subject activities and to travel to Maryland. She has claimed a total net worth of $107,890, although it appears that she reduced the asset portion of her statement by claiming only a one-half interest in her residence. Nevertheless, this Court finds Phelps–Davis's culpability is somewhat less than that of her father, and she is also comparatively less able to pay the award. Accordingly, the punitive damages award of $2 million against Defendant Rebekah A. Phelps–Davis is reduced to a total of $200,000, reflecting a $100,000 punitive damage award for each substantive claim.

The evidence in this case clearly indicated a far more aggressive posture on the part of Defendant Shirley L. Phelps–Roper. In traveling to Maryland with her father and sister to picket Lance Cpl. Snyder's funeral, Phelps–Roper brought four of her children with her. At trial, she proudly noted that she authored "The Burden of Marine Lance Cpl. Matthew Snyder," which was broadcast on the church's website. In light of her leadership role in these activities, this Court finds that the punitive damage award against Phelps–Roper should be larger than the awards against her father and sister. Phelps–Roper filed a personal financial statement indicating a total net worth of $271,357. This Court finds that a total punitive damages award of $600,000 against her is within the standards enunciated by the Supreme Court and the Court of Appeals of Maryland. Accordingly, the total punitive damage award of $2 million against Defendant Shirley L. Phelps–Roper is reduced to $600,000, which reflects a $300,000 punitive damage award as to each substantive claim.

Therefore, in reviewing the relative culpability of each Defendant and the respective financial statements, this Court reduces the total punitive damage award in this case from $8 million to $2.1 million.

The punitive damage award is specifically apportioned in the amount of $1 million as to Defendant Westboro Baptist Church, Inc., $600,000 as to Defendant Shirley L. Phelps–Roper, $300,000 as to Defendant Fred W. Phelps, Sr., and $200,000 as to Defendant Rebekah A. Phelps–Davis.

## IV. Motion for Relief

Next, Defendants have moved under Rule 60 of the Federal Rules of Civil Procedure for relief from judgment. Under Rule 60, this Court has discretion to relieve Defendants from the final judgment when any of the following can be shown:

(1) mistake, inadvertence, surprise, or excusable neglect;

(2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b);

(3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party;

(4) the judgment is void;

(5) the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or

(6) any other reason that justifies relief.

Fed.R.Civ.P. 60(b). As discussed in Part II, *supra,* Defendants have not shown the existence of any mistakes, and new evidence has not been introduced. Thus, the first two grounds for granting relief have not been met. In addition, Defendants have not raised any specific arguments why they should be afforded relief based on the remaining grounds. Defendants have not demonstrated fraud or misconduct by Plaintiff, established that the judgment is void, or indicated that the judg-

ment was already satisfied or based on an earlier judgment. Finally, this Court finds no other reason why Defendants should be relieved from the judgment. As discussed in Part III, *supra,* the amount of punitive damages is already being reduced to protect Defendants' due process rights. Accordingly, Defendants' Motions for Relief from Judgment pursuant to Rule 60(b) are DENIED.

## V. Motion to Stay

Finally, Defendants move to stay execution of the judgment pursuant to Local Rule 110(1)(a) and Rule 62 of the Federal Rules of Civil Procedure. Rule 62(b) permits a stay pending the disposition of post-trial motions made pursuant to Rules 50, 52(b), 59, and 60. Because this Memorandum Opinion and the accompanying Order decide each pending post-trial motion filed by Defendants, their motions for stay under Rule 62(b) are moot.

In contrast, under Rule 62(d), Defendants may obtain a stay of judgment while their appeal to the Fourth Circuit is pending. Although Rule 62(d) is silent as to the amount of the supersedeas bond, Local Rule 110(1)(a) of this Court requires that the supersedeas bond shall be 120% of the monetary judgment, plus an additional $500 to cover costs.[22] This Court has the discretion, however, to permit something other than a supersedeas bond to secure the judgment or simply require a bond in a different amount. *See* Local Rule 110(1)(a) (D.Md.2008).

Defendants have requested a stay without the necessity of posting a bond. *(See Pro se* Defs.' Mot. Stay 7; Church Defs.' Mot. Stay 6.)* This Court is not inclined to grant a stay in this case without the post-

22. The Rule states "[u]nless otherwise ordered by the Court, the amount of any supersedeas bond filed to stay execution of a money judgment pending appeal shall be 120% of the amount of the judgement plus an additional $500 to cover costs on appeal." Local Rule 110(1)(a) (D.Md.2008).

ing of any security for the judgment by these Defendants. Therefore, this Court withholds ruling on Defendants' motion to stay pending a showing of their ability to procure a supersedeas bond or other means to secure the total judgment in this case of $5 million, reflecting $2.9 million in compensatory damages and $2.1 million in punitive damages.

## CONCLUSION

For the foregoing reasons, the Motions for Judgment as a Matter of Law, Motions for Judgment Notwithstanding the Verdict, Motions for Reconsideration and Rehearing, Motions to Alter or Amend the Judgment, Motions for New Trial, Motions for Relief from Judgment, Motions for Any Other Relief in Law and Equity Warranted under the Facts and Law filed by Fred W. Phelps, Sr., Westboro Baptist Church, Inc., Shirley L. Phelps–Roper, and Rebekah A. Phelps–Davis are DENIED. Defendants' Motions for *Remittitur* are DENIED in part and GRANTED in part. Specifically, the motions are DENIED with respect to the compensatory damage award of $2.9 million, but GRANTED in part with respect to the total punitive damage award of $8 million, which is hereby reduced to $2.1 million. Accordingly, the total damage award in this case is reduced from $10.9 million to $5 million.

With respect to the Motions to Stay execution of the Judgment filed by all Defendants, this Court withholds ruling pending further proceedings. A separate Orders follows.

## ORDER

For the reasons stated in the foregoing Memorandum Opinion, this 4th day of February 2008, it is HEREBY ORDERED that:

1. The Motion for Judgment as a Matter of Law, Motion for Judgment Notwithstanding the Verdict, Motion for Reconsideration and Rehearing, Motion to Al-

ter or Amend the Judgment, Motions for New Trial, Motion for Relief from Judgment, and Motion for Any Other Relief in Law and Equity Warranted under the Facts and Law filed by Defendants Shirley L. Phelps–Roper and Rebekah A. Phelps–Davis (Paper No. 211) are DENIED;

2. The Motion for Judgment as a Matter of Law, Motion for Judgment Notwithstanding the Verdict, Motion for Reconsideration and Rehearing, Motion to Alter or Amend the Judgment, Motions for New Trial, Motion for Relief from Judgment, and Motion for Any Other Relief in Law and Equity Warranted under the Facts and Law filed by Defendants Fred W. Phelps, Sr., and Westboro Baptist Church, Inc. (Paper No. 215) are DENIED;

3. The Motions for *Remittitur* filed by Defendants Shirley L. Phelps–Roper and Rebekah A. Phelps–Davis (Paper No. 211) and Defendants Fred W. Phelps, Sr., and Westboro Baptist Church, Inc. (Paper No. 215) are GRANTED in part and DENIED in part, viz:

 a. The Motions are DENIED with respect to the compensatory damage award of $2.9 million entered against all Defendants by Order of this Court of November 2, 2007. All four Defendants are jointly and severally liable for said compensatory damage award. The Motions are GRANTED in part with respect to the punitive damage award of $8 million, which is reduced to a total of $2.1 million and apportioned as follows:

 i. As to Fred W. Phelps, Sr., the $1.5 million punitive damage award against him for intrusion upon seclusion is reduced to $150,000, and the $500,000 punitive damage award against him for intentional infliction

of emotional distress is reduced to $150,000, for a total punitive damages award of $300,000;

ii. As to Westboro Baptist Church, Inc., the $1.5 million punitive damage award against it for intrusion upon seclusion is reduced to $500,000, and the $500,000 punitive damage award against it for intentional infliction of emotional distress remains the same, for a total punitive damages award of $1 million;

iii. As to Shirley L. Phelps–Roper, the $1.5 million punitive damage award against her for intrusion upon seclusion is reduced to $300,000, and the $500,000 punitive damage award against her for intentional infliction of emotional distress is reduced to $300,000, for a total punitive damages award of $600,000;

iv. As to Rebekah A. Phelps–Davis, the $1.5 million punitive damages award against her for intrusion upon seclusion is reduced to $100,000, and the $500,000 punitive damage award against her for intentional infliction of emotional distress is reduced to $100,000, for a total punitive damages award of $200,000; and

4. The Clerk of the Court transmit copies of this Order and accompanying Memorandum Opinion to counsel of record and the *pro se* Defendants.